# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

JOHNNY RAY BROWN,

    *Petitioner*,

2:10-cv-00407-PMP-GWF

vs.

ORDER

BRIAN WILLIAMS, *et al.*,

    *Respondents*.

This habeas matter under 28 U.S.C. § 2254 comes before the Court for a final decision on the grounds that remain.

### Background

Petitioner Johnny Ray Brown challenges his 2002 Nevada state conviction, pursuant to a jury verdict, of three counts of sexual assault and one count each of battery with intent to commit a crime, burglary and grand larceny. He challenged the judgement of conviction in the state courts on direct appeal and state post-conviction review.

On federal habeas review, Petitioner presents a number of grounds, including a ground challenging the sufficiency of the evidence on the three counts of sexual assault. Brown maintains that he instead had a consensual sexual relationship with his stepdaughter.

The trial evidence tended to establish the following on the sexual assault counts.[1]

---

[1] The Court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court. The Court summarizes same solely as background to the issues presented in this case, and it does not summarize all such material. No statement of fact made in

(continued...)

1    In March 2000, Nichole Coates was Johnny Ray Brown's stepdaughter.  She then was

2    eighteen, and Brown was in his early forties.  Coates worked at a Subway sandwich shop on

3    Sahara and Eastern in Las Vegas, Nevada.  Her mother, Mary Stadler, was the manager; and

4    Brown was the assistant manager.  They worked a daytime shift and Coates worked an

5    evening shift.  Brown and Coates' mother lived in an apartment that was only a short distance

6    away, at Karen and Eastern, perhaps a five minute walk from the Subway.  At that time,

7    Coates lived in Henderson, Nevada, an outlying suburb of Las Vegas.  She did not have a

8    car, and she would catch rides to get around town.  Coates occasionally would stay over at

9    her mother's apartment.  She testified that she did not spend much time there, however,

10   because she did not get along with Brown and did not feel comfortable around him.  Stadler

11   also did not schedule them on the same shift because they did not get along.[2]

12   During the evening hours of March 20, 2000, Nichole Coates was visiting a friend at

13   an apartment in the same building as her mother's apartment.  At approximately 12:30 to 1:00

14   a.m. on what by then was March 21, 2000, Coates went to her mother's apartment.  Her

15   mother was either asleep or laying down in the bedroom, and Brown was in the living room

16   drinking and singing loudly with both music and the television also playing loudly.  Coates

17   went to the bedroom.  Her mother shouted to Brown to turn off the sound and go to sleep, but

18   he ignored her.  After getting a snack, Coates laid down to sleep beside her mother on her

19   mother's side of the bed.[3]

20   Later in the night, Coates awoke to find Brown sitting beside her on the bed, *i.e.* sitting

21   by her on the edge of the bed on her mother's side of the bed.  Coates and then her mother

---

[1](...continued)
describing statements, testimony or other evidence in the state court constitutes a finding by this Court.  The
significance of other evidence or categories of evidence referred to by Petitioner in support of his claims is
addressed in the discussion of the particular claims.  The present recital of the evidence constitutes only an
overview for context.  Any absence of mention of a specific piece of evidence or category of evidence in this
overview does not signify that the Court has overlooked the evidence in considering Petitioner's claims.

[2]#29, Ex. 55, at 26-31, 91-92 & 125 (Coates); *id.*, Ex. 57, at 35-39, 41-43, 64, 67-68 & 103 (Stadler);
see also *id.*, at 111-13 (coworker); #67, Ex. 132, at 53.

[3]*Id.*, Ex. 55, at 31-34 & 86-88 (Coates); *id.*, Ex. 57, at 42-44, 81-86 & 101-02 (Stadler).

1   yelled at Brown, and Coates went to the living room.  She turned off the television and went

2   to sleep on the couch with a comforter and blanket wrapped around her.[4]

3          Later that morning, Nichole Coates, as she described it, "got woke up to a frying pan."

4   That is, she was woken up by Brown hitting her on the head with a frying pan.  She did not

5   know how many times Brown had hit her before she woke up, but it was Brown hitting her with

6   a cast iron skillet that woke her up.  He was sitting on the coffee table by the couch with what

7   by then was only a remaining part of the skillet in his hand.  Mary Stadler testified that the

8   skillet neither had been out nor had it been broken prior to when she left for work earlier that

9   morning.[5]

10         Brown then gripped Coates' arm tightly.  He told her that if she did what he said that

11  he would not kill her.  He told her that he had a pistol close by.[6]

12         Brown pushed the comforter away and started rubbing Coates' breasts through her

13  shirt.  She started crying and told him "no."  Brown told her that if she did not shut up she

14  would not live anymore.  When Coates tried to resist, Brown gripped her arm with even

15  greater force, pressing and pinning her arm down against the couch, telling her, again, that

16  if she did not do what he said, he would kill her.[7]

17         Brown unbuttoned the overalls that Coates was wearing, put his hand inside the

18  overalls, and started rubbing her vagina.  She continued saying "no" even louder and trying

19  to resist and move away from his grip.  He continued to grip her arm tightly, and he told her

20  again that if she did not stay still and do what he said, he would kill her.[8]

21         Brown then stood Coates up while pulling her overalls all the way off her.  To do this,

22  he gripped her arm even tighter and forcefully lifted her up.  She continued crying, telling him

23  ────────────────────

24         [4]#29, Ex. 55, at 34-37, 95-97 & 100-01 (Coates); *id.*, Ex. 57, at 43-44 & 85 (Stadler).

25         [5]*Id.*, Ex. 55, at 37-39 & 97-101 (Coates); *id.*, Ex. 57, at 45-46 (Stadler).

26         [6]*Id.*, at 39-40 & 102.

27         [7]*Id.*, at 40 & 102-03.

28         [8]*Id.*, at 40-41, 54-55 & 103.

"no," and tried to sit back down and move away from Brown.  He forced her to stand up, telling her that if she wanted to live, she would do what he said.[9]

Brown then took Coates by the arms and forced her into the bedroom, telling her that if she did not go he would kill her.  He forced her onto the bed, and he then took off her shirt, bra and panties while still gripping her arm.  Brown then started touching Coates' breasts again.  He inserted his fingers and then his tongue into her vagina.  Brown, who had disrobed by this time, then penetrated her vagina with his penis with Coates laying on her back.  He then flipped her over onto her stomach, with the comforter on the bed partially underneath her, and again penetrated her vagina with his penis, until he ejaculated.[10]

Brown flipped Coates onto her back again and started choking her.  Coates said to him that she did not want to die and to not kill her.  Brown said that he knew that Coates and her friends had stolen a vehicle of his that had been repossessed.  He then told her to perform oral sex on him but to not bite him.  Coates did not comply.  Brown said that he had not allowed any of her male friends to come over because they could not do anything for her that he could not do and that all that she needed was him.[11]

Coates, still crying, tried to convince Brown that she would not call the police or tell anyone.  Brown let Coates sit up on the edge of the bed, but he continued to hold her firmly by the arm.  At one point, Brown stated that he knew that he had done wrong and should not have done so but that even if he went to jail he got what he always wanted.[12]

Several minutes later Brown released Coates' arm.  He told her that she had to take a shower so that there would not be any evidence.  Coates tried to stall him, first getting him to allow her to go to the kitchen to get a drink of water, with Brown again holding her by her arm.  Ultimately, however, he forced her to go to the shower in the bathroom, physically

---

[9]#29, Ex. 55, at 41-42.

[10]*Id.*, at 41-46, 55-56 & 103-08.

[11]*Id.*, at 46-47 & 107-08.

[12]*Id.*, at 47.

1    forcing her with his hold on her arm to the bathroom.  He had picked up a butcher knife at
2    some point while they were in the kitchen, and he threatened her with the butcher knife.  He
3    again told her that if she wanted to live that she would do what he told her to do.  He said that
4    it would be very easy to kill her and that no one would even know, that he could pretend that
5    he came home and found her dead.[13]

6         Coates got in the shower, but she tried to stay as far away from the running water as
7    she could without Brown noticing as he stood nearby.  When she got out, Brown, with the
8    butcher knife still in hand, made her get dressed in clothes that he had picked out for her.  He
9    then made her brush her hair.  She still had been telling him that she would not tell the police.
10   Coates then saw her face in the mirror, and she could see the swelling from where she had
11   been hit on the head.  When Brown asked what she was going to say to her mother about
12   that, Coates said that she would tell her that she got beat up outside the apartment.  Brown
13   was skeptical at first, but Coates persisted.[14]

14        Brown then set the knife down, and he started to get in the shower.  Coates ran for the
15   door and was able to get through the locked door before Brown was able to turn off the
16   shower and come after her.  She ran to the friend's apartment, in the same building, where
17   she had been visiting before she went to her mother's apartment the prior evening.[15]

18        The friend was home.  Coates – immediately – asked to use his phone.  She told her
19   friend – again, immediately – that  her mother's husband had just raped her and that she
20   needed to call 911.[16]

21        Coates – immediately – called 911.[17]

22        / / / /

23   _____

24   [13]#29, Ex. 55, at 47-49 & 108-13.

25   [14]*Id.*, at 49-51 & 114-19.

26   [15]*Id.*, at 51, 56-57, 92-94 & 117-19.

27   [16]*Id.*, at 51-52.

28   [17]*Id.*, at 52 & 57-58.  The 911 tape was played for the jury.  *Id.*, at 57-58.

1    Coates then called her mother at the Subway – immediately after the 911 call.  She
2    told her that Brown had just raped her and to lock the door because Coates did not know what
3    he might do. Stadler described her voice as: "It was terror, she was scared to death."[18]

4    As she was hanging up from the call, Stadler saw Brown running across the parking
5    lot in front of the sandwich shop.  He got into their car, "gave her the finger," waved goodbye,
6    and drove away "[a]s fast as he could get out of there."[19]

7    Paramedic Dianna Toney was dispatched at 11:12 a.m. and arrived at the friend's
8    apartment at 11:23 a.m.  Nichole Coates was sitting quietly at a table crying softly, but she
9    was calm enough to give a rational statement.  Coates told Toney that she had been sleeping
10   on the couch, that she was awoken by her mother's husband hitting her with a frying pan on
11   the right side of the head, that he raped her, and that he forced her to take a shower after the
12   rape while holding a butcher knife.  Coates stated that she did not wash her genital area while
13   in the shower.  She also stated that she was hit in the back of the head after she was raped.[20]

14   Toney observed a contusion and bruise on Coates' right eyelid, a contusion on the right
15   side of her head and face, some scrapes on her right arm, and a bit of a contusion around her
16   right elbow, which probably would have produced blood at some point.[21]

17   About an hour after the initial 911 call, the crime scene analyst took photographs of the
18   apartment reflecting, *inter alia*, the clothes that Coates had said that Brown had taken off her
19   at the various locations.  The analyst recovered, *inter alia*, a comforter that later tested
20   positive for the presumptive presence of semen and the pieces of the frying pan.  The analyst
21   was unable to secure fingerprints from the handle due to the type of surface involved.[22]

22   / / / /

23   _____

24   [18]#29, Ex. 55, at 58-59 (Coates); *id.*, Ex. 57, at 39-40 & 87 (Stadler).

25   [19]*Id.*, Ex. 57, at 39-42 & 86-88 (Stadler).

26   [20]*Id.*, Ex. 55, at 126-31 & 134-36.

27   [21]*Id.*, at 128-29 & 132-33.

28   [22]*Id.*, at 136-51, 154-68 & 172-76 (crime scene analyst); see also *id.*, at 65-67 (Coates).

1    Photographs of Coates taken shortly after 2:15 p.m. at the hospital showed fresh

2  bruising and injuries to her forehead, the right side of her face and neck, and her elbows.  The

3  crime scene analyst who took the photographs testified that there was redness and bleeding

4  in the facial injuries consistent with Coates having been hit by something or someone.  The

5  analyst declined to opine, as she was not a physician, as to the age of the bruising or the

6  extent to which there would have been surface bleeding from Coates' injuries.[23]

7    The sexual assault nurse examiner was the first and only person to examine Nichole

8  Coates in the triage unit at the hospital, with her exam starting between 12:30 and 1:00 p.m.

9  When she examined her, Coates was frightened, agitated, angry, and in physical pain.  She

10  testified that most sexual assault victims were frightened and agitated after being sexually

11  assaulted and that they also tended to be angry if they knew the assailant.[24]

12    Coates had a black eye; a bump on the back of her head; abrasions to her forehead,

13  neck, eye and cheek; and abrasions and bruises on her arms.[25]

14    At the time that the photographs were taken, the blood then was building up on the top

15  lid of the black eye.  The eye was closing but not quite yet swollen completely shut from the

16  swelling.  The eye could be opened only with manual assistance or extreme effort.[26]

17    The bump on the back of Coates' head was not immediately visible to the eye.

18  However, the nurse could feel the soft tissue swelling when she manually palpated the area.[27]

19    Regarding the bruising and abrasions on Coates' forehead, face, neck, and arms, the

20  nurse testified that from the coloring it was evident that they were recent injuries.[28]

21    / / / /

22  _____

23  [23]#29, Ex. 55, at 152-54 & 169-71 (crime scene analyst); *see also id.*, at 61-64 (Coates).

24  [24]*Id.*, Ex. 57, at 3-4, 9, 11-13 & 29.

25  [25]*Id.*, at 4-10, 22-23 & 30-31.

26  [26]*Id.*, at 4 & 8-10.

27  [27]*Id.*, at 4-5.

28  [28]*Id.*, at 8-10 & 31.

The nurse did not observe any trauma to the vaginal area.  She testified that there was no trauma in about forty-five percent of overall sexual assault cases.  If there was a threat of injury or death by the attacker, there was little resistance by the victim.  She testified that the victim would tend to comply with the assailant at that time because "[s]elf-preservation is the main motive at that time."  Where there was a threat of force, she testified that ninety percent of the cases would show no trauma.[29]

The nurse did not observe the presence of semen at least in the assisted visual examination that she performed.  She testified that this was not common.  The nurse elaborated, however, that different males secrete different amounts of semen.  Moreover, Coates had been in the shower, had changed clothes, and also had urinated prior to the exam.  Both urination and the act of wiping after could result in the loss of evidence.[30]

Coates told the nurse, *inter alia*, that she had been hit in the head, face, back of the head, and arm and elbow areas with a frying pan, that the assailant had her take her clothes off, that he told her that he had a gun but that she never saw it, that he put his mouth on her vagina and then his penis in her vagina, that she believed that he ejaculated, that he had her take a shower while armed with a butcher knife, and that she was able to leave when he got into the shower.[31]

The nurse checked "yes" for responses by Coates as to penetration of the vagina, mouth, and rectal area.  However, a "yes" would be marked on that portion of the form for touching of the area without actual penetration, as the purpose of that portion of the form was to identify areas for the nurse to swab for the possible presence of semen.[32]

/ / / /

---

[29]#29, Ex. 57, at 6-7 & 13-17; see also *id.*, at 23-28 (acknowledging that she might have testified in an earlier case then to a thirty-five percent figure as to the percentage of overall cases without trauma).

[30]*Id.*, at 10, 11, 21-22 & 30.  As discussed herein, Brown did not deny sexual activity with Coates.  He instead claimed that the sex was consensual.

[31]*Id.*, at 7.

[32]*Id.*, at 8, 19, 29-30 & 32-33.

1    The nurse acknowledged on cross-examination that Coates said that her vagina had
2    not been penetrated by Brown's finger (as opposed to be his tongue and penis), that he had
3    placed his mouth on her vagina in addition to penetration with his tongue, that his finger had
4    "penetrated" her rectum (at least in the sense used in completing the form), that he had either
5    kissed or licked her mouth, and that she had scratched Brown.[33]

6    The nurse testified on cross-examination that Coates "was not coherent in her thoughts
7    as far as what happened in what order," that "she was like having flights," and that "[s]he
8    would say one thing and then it would not be in context [of] what happened at that particular
9    time." She testified that "[i]t's not uncommon for victims to space out at different points." The
10   nurse observed that "she was still in semi-shock," and that "her sequencing was not good at
11   that time." According to the nurse, "'she'd say something and then say, oh, no, that happened
12   later or no, that happened like this way or that way."[34]

13   When Stadler saw her daughter at the hospital, Nichole Coates' face was black and
14   blue and swollen, and she was trembling and crying.  Stadler further testified that her
15   daughter was "[t]rembling, shaking, crying, totally upset," "a little bit angry," and experiencing
16   "[a] lot of emotions."[35]

17   When Coates spoke to the investigating detective, Detective Debbie Love, she once
18   again stated, consistent with her prior statements immediately after the attack and thereafter,
19   that her stepfather had hit her in the head with a frying pan and then sexually assaulted her.
20   Detective Love testified that while Coates was rational, she "was a little bit distraught" and that
21   she cried several times during the interview.[36]

22   The state trial court allowed the defense to cross-examine Detective Love about
23   alleged inconsistencies between Coates' statement to the detective and Coates' trial

24   _____

25   [33]#29, Ex. 57, at 17-20.

26   [34]*Id.*, at 22 & 29.

27   [35]*Id.*, at 50-55 & 91.

28   [36]*Id.*, at 158, 174 & 185.

1   testimony, as to which alleged inconsistencies the defense had not inquired about first in

2   cross-examining Coates.[37]

3        The defense sought to establish, *inter alia*, the following, alleged, inconsistencies in

4   Coates' statement: (a) that there was no altercation between her and Brown the night before;

5   (b) that she was laying on her back rather than her side when Brown hit her with pan; (c) that

6   Brown asked her about her sexual relationships and went through her purse and found

7   condoms; (d) that all of her clothes were removed by Brown in the living room; (e) that Brown

8   laid her on her back and started kissing her before he penetrated her with his penis; (f) that,

9   when Coates went to get a drink in the kitchen after the attack, she walked there first with him

10  following, after she tried to convince him that she would not call the police; and (g) that she

11  first saw the knife after she got out of the shower and he then walked out and put it away.[38]

12       The prosecution established on redirect that Coates related in her statement to the

13  detective, *inter alia*: (a) that the kiss came only after Brown threatened to shoot Coates, with

14  Brown saying "either kiss me or die;" and (b) that Brown's questioning her about other sexual

15  relationships and finding condoms in her purse occurred after he sexually assaulted her.[39]

16       Four days after the attack, on March 25, 2000, the vehicle in which Brown apparently

17  had left Las Vegas was recovered, without Brown, in Missouri.[40]

18       About a week after the attack, Brown called Stadler and told her that he had been

19  having consensual sex with Coates.  Stadler would not talk with him.  She did not believe him

20  because "they never were ever close, they were always at each other's throats."[41]

21       / / / /

22

23       [37]#29, Ex. 57, at 175-79.  *But cf.* N.R.S. 50.135(2)(b)("Extrinsic evidence of a prior contradictory
    statement by a witness is inadmissible unless . . . [t]he witness is afforded an opportunity to explain or deny
24  the statement and the opposite party is afforded an opportunity to interrogate the witness thereon.").

25       [38]#29, Ex. 57, at 186-98 & 201-03.

26       [39]*Id.*, Ex. 58, at 2-7.

27       [40]*Id.*, Ex. 57, at 162.

28       [41]*Id.*, at 103-05.

1    Sixteen days after the attack, on April 6, 2000, Brown was apprehended in Michigan

2    at his sister's house.  He tried to pass himself off to officers instead as his brother.  The

3    officers inside the house at the time, as opposed to the uniformed officer on detail at the rear

4    of the house, were dressed in civilian clothes.  However, they identified themselves as officers

5    and plainly displayed badges hanging from their necks on lanyards.  The officer who testified

6    at trial did not observe, at the arrest, any injuries to Brown's face.[42]

7    Detective Love interviewed Brown in custody back in Las Vegas on April 18, 2000.[43]

8    Brown acknowledged having sex with Nichole Coates on March 21, 2000.  According

9    to Brown, he and Coates had been having a sexual relationship since between the Christmas

10   and New Year's holidays in 1998.  He maintained that, prior to that time, they had been very

11   friendly, hugging frequently.  He stated that, once they became sexually involved, they had

12   sex at least twenty times prior to March 21, 2000.[44]

13   Brown told Detective Love that Coates also "used to bring a bunch of guys over too."

14   Coates' mother typically went to bed early, and according to Brown, "[h]er and the guys would

15   have sex in the living room on the floor and stuff like that."[45]

16   According to Brown, he took Stadler and Coates out for dinner earlier in the evening

17   of March 20, 2000, and they were drinking and smoking marijuana.  He maintained that, later,

18   after her mother had gone to sleep, her former boyfriend and a friend came over and they

19   stayed up doing more drinking and smoking.[46]

20   / / / /

21

22   [42]#29, Ex. 57, at 144-50.

23   [43]*Id.*, at 163-66.

24   [44]#67, Ex. 132, at 2-3, 5, 17-19, 24-25, 30-37, 39-47 & 52-53; #29, Ex. 57, at 144-50.  The transcript

25   of the statement filed on federal habeas review was introduced as State Exhibit 23, which was read by jurors during a reading break dedicated to that purpose.  The blank spaces in the transcript represent redactions.

26   See #29, Ex. 55, at 176-79; *id.*, Ex. 57, at 2 & 166.

27   [45]#67, Ex. 132, at 58.

28   [46]*Id.*, at 5-7, 55-57 & 61-62.

-11-

1      Under Brown's account, the next morning on March 21, 2000, he and Coates had sex

2 after her mother left for work.  He said that they started to become intimate on the couch and

3 then had sex in the bedroom.  Coates purportedly had three orgasms during oral sex.  Brown

4 stated that Coates became angry when they were talking after the consensual sex because

5 he would not leave her mother for her and told her that he would not have sex with her

6 anymore.  He told the detective that this made Coates mad because she told him that other

7 men could not make her orgasm like he could.[47]

8      According to Brown, Coates retrieved a switchblade from a cabinet and started

9 brandishing it at him.  As his account continues, Coates then took a shower and attacked him

10 barehanded afterwards.  Brown maintained that he threw her down on the floor as they

11 struggled.  According to Brown, she then reached over, grabbed the frying pan, and struck

12 him in the head with it.  He maintained that he took the frying pan from her, hit her in the face

13 with the frying pan but only once, and then threw it.  Brown told the detective that the injuries

14 to the back of Coates' head must have occurred when he threw her to the floor.[48]

15      During the April 18, 2000, custodial interview, Brown showed Detective Love a bump

16 on his head.  She felt the bump, but she did not see any bruising, and she did not know if the

17 bump was from the March 21, 2000, incident almost a month earlier.[49]

18      Detective Love also asked Brown whether the frying pan broke at that point.  He

19 responded: "I don't know. _____ after I hit her, I just threw it."  He further said: "I don't know

20 where it go to."[50]

21      As Brown's account continued, Coates went back into the shower and settled down.

22 He stated that he joined her in the shower and then she asked to wear one of his shirts.

23 According to Brown, Coates then left, but he followed her because "I knew what she was

24

25    [47]#67, Ex. 132, at 62-64 & 67-81; #29, Ex. 57, at 169.

26    [48]#67, Ex. 132, at 81-87; #29, Ex. 57, at 168-70 & 174.

27    [49]#29, Ex. 57, at 170-71.

28    [50]#67, Ex. 132, at 87.

1    gonna do." He knew that she was going to tell her mother that he raped her, because Coates

2    wanted him to leave her mother for her. According to his account, he followed her "right to

3    Subway," contrary to the testimony that Coates was seen by paramedics at the apartment

4    complex and never went to the Subway that day after the attack. Brown maintained that he

5    then waved to Stadler, said "I'll be back," and left.[51]

6            Brown's assertion that he knew that Coates was leaving the apartment to accuse him

7    of rape stood in contrast to his statement at the beginning of the interview. When Detective

8    Love asked Brown on April 18, 2000, whether he was aware that he had been accused of

9    raping Coates, he responded: "I just got aware of it when I got down here."[52]

10           Detective Love also asked Brown about an incident the day after the sexual assault

11   in which he went into the back room of the Subway in his work uniform when Stadler was not

12   there and stole money from the store.[53]  Brown told the detective that both of the young

13   women employees who observed him at the time were lying. When the detective asked him

14   why the young women would lie, he stated that he thought that one of the women was a

15   lesbian and that she was having a sexual relationship with Mary Stadler.[54]

16           While in custody, Brown also made statements to a corrections officer in which he

17   maintained that he had had only consensual sex with Coates.[55]

18           Additional testimony reflected the following regarding how long Nichole Coates had

19   known Brown, following upon testimony initially elicited by defense counsel on cross-

20   examination of Coates.

21           / / / /

22

23           [51]#67, Ex. 132, at 87-90. #29, Ex. 57, at 171 & 173.

24           [52]*Id.*, at 3.

25           [53]The Court discusses the charges regarding the stolen money in more detail in regard to Ground 2.

26           [54]#67, Ex. 132, at 91-93.

27           [55] #29, Ex. 57, at 150-56 (the statements were made in the course of a running belligerent tirade in
28   which Brown threatened the officer and his family).

Before they moved to Las Vegas, Coates and her mother had lived together in Pennsylvania and prior to that in North Carolina. Coates testified that they lived together in an apartment along with their boyfriends in Pennsylvania. Stadler acknowledged that her daughter's boyfriend was in his thirties and that she started dating him when she was fifteen. She maintained that Coates' boyfriend lived nearby rather than with them in North Carolina.[56]

While in Pennsylvania, Coates' mother broke up with her longstanding boyfriend, and she later became involved with Brown. He ultimately moved into the apartment with Coates' mother, Coates, and her boyfriend.[57]

A short time, later, however, Brown and Coates' mother moved to Las Vegas, with Coates and her boyfriend staying behind in Pennsylvania. Coates and her boyfriend followed a short time thereafter, however, and they initially stayed with Brown and her mother. They then moved to another apartment in the same complex up until the point where Coates broke up with her boyfriend, for being physically abusive. It was then that Coates moved out to Henderson, but she still had some of her clothes at her mother's apartment. Brown had given her a ride a couple of times out to Henderson, at her mother's request.[58]

Defense counsel also elicited the initial testimony from Coates regarding an incident about six months earlier during which Brown attempted to kiss Coates and an altercation ensued. Coates was visiting her mother at their apartment, when she and Brown were at a different complex. Brown and Coates' mother were arguing, and Brown said to her mother that she had better watch herself, referring to a knife that he had just set down. Coates asked Brown "what are you going to do," and she then followed her mother to the bathroom. Brown followed and attempted to kiss Coates. She slapped him hard with an open hand, and he punched her in the mouth and then continued punching her in the stomach. Coates fell to the ground as Brown punched her, but she eventually was able to break free and leave with her

---

[56]#29, Ex. 55, at 69-73 (Coates); *id.*, Ex. 57, at 34-35, 61-63 & 107-08 (Stadler).

[57]*Id.*, Ex. 55, at 69-73 (Coates); *id.*, Ex. 57, at 34-35 & 63-64 (Stadler).

[58]*Id.*, Ex. 55, at 73-85 (Coates); *id.*, Ex. 57, at 34-35, 64-71 & 94-95 (Stadler).

mother to a 7-11 to call the police.  Brown left before the police could apprehend him and no arrest had been made by the time of the second incident in March 2000.  Coates had a cut lip and bruises from the first incident, but she did not seek medical attention.[59]

The defense called two witnesses to testify.  Their testimony collectively pertained to how Brown and Coates related to one another and/or Coates' demeanor after the attack.

Mary Cyronek was the resident administrator, or manager, of the apartment complex in which Stadler and Brown had their apartment.[60]

Cyronek testified that Brown and Coates came to the office on two occasions, once regarding a work order and another time to obtain an air filter. She testified initially:

> I believe at one time he came in with Nichole and there was a work order that needed to be done in the apartment and he told me what it was.  I asked him if we could have permission to enter, he said yes.  She was with him, they seemed very friendly.  On another occasion, I think they came up and got an air filter for their – for his and Mary's apartment.  And they seemed, you know, very friendly then at the time, *friendly as in just, you know, they just came in, said hello.  They were very nice to us, they always had been as we had been to them*.

#29, Ex. 58, at 23 (emphasis added).   Defense counsel thereafter characterized this testimony as being that "they seemed to be friendly with one another" in a compound question primarily directed to distinguishing Brown and Coates from Brown and Stadler.[61]  Cyronek affirmed that she did not notice any animosity between Brown and Coates -- when they were in the office briefly while requesting a work order and later getting an air filter.[62]

On cross-examination, Cyronek acknowledged that Brown and Coates did not appear to be affectionate in her presence.[63]

/ / / /

---

[59] #29, Ex., 55 at 85, 88-90 & 119-25 (Coates); *id.*, Ex. 57, at 36-37 & 70-73 (Stadler).

[60] *Id.*, Ex. 58, at 21.

[61] *Id.*, at 24.

[62] *Id.*

[63] *Id.*, at 28.

1    No testimony was elicited from Cyronek that she had any dealings with Brown and

2 Coates together other than during these two brief incidents, that she had any basis for

3 knowing how they related to one another in private as opposed to in public, that she observed

4 any specific behavior – such as affectionate touching or glances – suggesting that Brown and

5 Coates were intimate, or that she had any basis whatsoever for believing that they were

6 engaging in a consensual sexual relationship merely because they did not show animosity to

7 one another in the few minutes in public that it took, for example, to get an air filter.

8    Cyronek also testified regarding her observation of Coates on two occasions after the

9 attack.

10    With regard to the first occasion, Cyronek observed Coates shortly after the attack

11 while she was making her rounds:

12          Well, on that day, I was walking [the] property as I normally
          do every day, and I came upon Apartment 169 and I saw a
13          couple of police officers outside.  I went over and inquired, you
          know, what was going on, and they had told me that she had –
14          there was a girl that lived, that was in Apartment 201 that was
          allegedly raped.  And I looked inside, I would say I was maybe
15          fifteen feet away.  I saw Nichole sitting there talking to two
          officers, her hands were folded like this, I can't recall if she was
16          crying or not.  And they said we've got everything, you know,
          under control and I said, okay, fine, and so I just went back to
17          office.

18 #29, Ex. 58, at 25.  When asked immediately thereafter whether anything struck her as

19 unusual about Coates behavior at that time, she responded: "No, not really.  Not at that time,

20 no."

21    The foregoing was the entirety of the examination on direct on the point.

22    On cross-examination, it was established that Cyronek was standing in the doorway

23 "two, three minutes at the most;" that she saw only a side view of Coates from the fifteen feet

24 away; that the side that she saw was Coates left side, which would have been the opposite

25 side from her facial injuries; that Coates was sitting slumped over with her elbows on her

26 knees; and that Cyronek neither had any face to face contact with Coates nor spoke with her.

27 #29, Ex. 58, at 28-30.

28    / / / /

In sum, Cyronek's testimony on this point provided no more insight into whether or not Coates had been raped than would testimony by any other lay bystander observing a rape victim for "two, three minutes at the most" from one side from fifteen feet away while they were being interviewed by law enforcement professionals.

With regard to the second occasion, Mary Stadler and Nichole Coates came to the office the next day accompanied by a female police officer.  The police were seeking to move Stadler and Coates out of the apartment to another location for their protection.  Cyronek testified that during the ten minutes that Coates also was in the office she was bored and wanted to leave.  This struck Cyronek "as a little funny for somebody who's supposedly allegedly raped that, you know, wasn't upset or anything like that."  Cyronek testified that in her opinion, "I just, with my own self, that if somebody had been raped that they would seem a little bit more nervous, more . . . [counsel supplies word] . . . [y]eah, traumatized, that's the word I want to use, traumatized."  Cyronek testified that Coates was not "shaking in terror" – the day after the attack – and that she instead acted bored and like it was an imposition to be there, asking two times if they could leave.[64]

The resident apartment manager acknowledged on cross-examination that she never personally had had any contact with a rape victim.[65]

The second defense witness, Kathryn Uhrich, previously had been a roommate and coworker with Coates.  Uhrich in the main corroborated testimony by prosecution witnesses, including Coates, that: (a) Coates did not like Brown; (b) she did not like him because he made sexual advances toward her when her mother was not nearby; and (c) she therefore did not like going to her mother's apartment when she was not around.  Uhrich testified that it was Brown only that made sexual advances and that they were not acted on by Coates.

---

[64]#29, Ex. 58, at 25-27.

[65]*Id.*, at 30-32.

Cyronek otherwise corroborated testimony by State witnesses that Coates was not on the lease for the apartment and did not have a key to the apartment.  *Id.*, at 22-23.

1    Uhrich's last contact with Coates was in the summer of 1999, approximately nine months

2    before the attack.[66]

3         No other evidence was introduced at trial in an attempt to call the State's evidence into

4    question by corroborating Brown's assertion that he was having a consensual sexual

5    relationship with Coates on and prior to March 21, 2000.

6                              ***Standard of Review***

7         The Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly

8    deferential" standard for evaluating state-court rulings that is "difficult to meet" and "which

9    demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*,

10   131 S.Ct. 1388, 1398 (2011).  Under this highly deferential standard of review, a federal court

11   may not grant habeas relief merely because it might conclude that a decision was incorrect.

12   131 S.Ct. at 1411.  Instead, under 28 U.S.C. § 2254(d), the court may grant relief only if the

13   decision: (1) was either contrary to or involved an unreasonable application of clearly

14   established law as determined by the United States Supreme Court based on the record

15   presented to the state courts; or (2) was based on an unreasonable determination of the facts

16   in light of the evidence presented at the state court proceeding.  131 S.Ct. at 1398-1401.

17        A state court decision on the merits is "contrary to" law clearly established by the

18   Supreme Court only if it applies a rule that contradicts the governing law set forth in Supreme

19   Court case law or if the decision confronts a set of facts that are materially indistinguishable

20   from a Supreme Court decision and nevertheless arrives at a different result.  *E.g.*, *Mitchell

21   v. Esparza*, 540 U.S. 12, 15-16 (2003).  A decision is not contrary to established federal law

22   merely because it does not cite the Supreme Court's opinions.  *Id.*  Indeed, the Court has held

23   that a state court need not even be aware of its precedents, so long as neither the reasoning

24   nor the result of its decision contradicts them.  *Id.*  Moreover, "[a] federal court may not

25

26   _____

27         [66] #29, Ex. 58, at 33-34, 37-40 & 41-42.

28        Uhrich otherwise testified to the collateral matter of Coates' prior abusive relationship with her former
     boyfriend.

                                      -18-

overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." 540 U.S. at 16. For, at bottom, a decision that does not conflict with the reasoning or holdings of Supreme Court precedent is not contrary to clearly established federal law.

A state court decision constitutes an "unreasonable application" of clearly established federal law only if it is demonstrated that the state court's application of Supreme Court precedent to the facts of the case was not only incorrect but "objectively unreasonable." *E.g., Mitchell*, 540 U.S. at 18; *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of Section 2254(d)(2) controls on federal habeas review. *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id*. The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." 393 F.3d at 973. Rather, AEDPA requires substantially more deference to the state court's determination:

> . . . . [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence.

The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Pinholster*, 131 S.Ct. at 1398.

### *Discussion*

### *Ground 3:  Sufficiency of the Evidence*

The Court discusses Ground 3 before the remaining grounds because it provides context for the remaining claims.

1    In Ground 3, Petitioner alleges that there was insufficient evidence to sustain his

2  conviction for three counts of sexual assault because he allegedly instead had a consensual

3  sexual relationship with his stepdaughter.

4    On direct appeal, the Supreme Court of Nevada rejected the claim presented to that

5  court on the following grounds:

6        . . . Brown contends that insufficient evidence was
     adduced at trial to support his conviction on three counts of
7     sexual assault. Brown argues that he had a consensual sexual
     relationship with his stepdaughter, and that she "was never raped,
8     but was acting as a hurt and jilted partner" because he refused
     [to] leave her mother. In support of his contention, Brown cites to
9     allegedly inconsistent statements made by the victim, and points
     out that a witness testified at trial that after the attack, "she did
10    not notice any unusual behavior on the part of [the victim]." We
     conclude that Brown's contention is without merit.

11
        Evidence of sexual penetration is required to sustain a
12    conviction for sexual assault.  Pursuant to NRS 200.366(1), the
     State must prove that the sexual penetration occurred "against
13    the will of the victim or under conditions in which the perpetrator
     knows or should know that the victim is mentally or physically
14    incapable of resisting."  Sexual penetration is defined in NRS
     200.364(2) as "cunnilingus, fellatio, or any intrusion, however
15    slight, of any part of a person's body . . . into the genital or anal
     openings of the body of another, including sexual intercourse in
16    its ordinary meaning."

17        In this case, our review of the record on appeal reveals
     sufficient evidence to establish guilt beyond a reasonable doubt
18    as determined by a rational trier of fact." In particular, we note
     that the victim testified to the following facts at trial. After finishing
19    a late shift at work, she arrived at her mother's apartment around
     12:30-1:00 a.m., hoping to sleep. She found her mother asleep
20    in the bedroom and Brown in another room listening to music and
     watching television, so she slept beside her mother in the bed. At
21    a certain point during the night, the victim awoke to find Brown
     sitting on the bed next to her. She immediately jumped up and left
22    the room, and went to sleep on the couch in the living room.

23        After her mother left work the following morning, the victim
     was awakened when Brown hit her over the head with a cast iron
24    skillet.  Brown told her that he had a pistol but would not kill her
     if she did what he said. With a tight grip around her arm, Brown
25    proceeded to grope her breasts, outside and underneath her
     shirt. The victim protested repeatedly and cried. Brown told her
26    that if she did not quiet down, he would kill her, and then took off
     her pants. The victim testified that Brown forcibly carried her into
27    the bedroom. Despite her continuous crying and resistance,
     Brown digitally and orally penetrated her vagina, and ultimately
28    engaged in sexual intercourse.

-20-

1
2
3
4
5
6
7
8
9

> Based on the above, we conclude that the jury could reasonably infer from the evidence presented that Brown committed three counts of sexual assault. Although the medical examination revealed no conclusive evidence of a sexual assault, the nurse who examined the victim testified at trial that in approximately "forty to forty-five percent of [sexual assault] cases, there is no trauma." Photographs taken of the victim and witness testimony confirmed the victim's injuries, yet the victim's uncorroborated testimony alone would have been sufficient to prove that a sexual assault had occurred. Additionally, evidence of Brown's flight after the assault is relevant to demonstrate consciousness of guilt. As this court has stated many times, it is for the jury to determine the weight and credibility to give any allegedly conflicting testimony, and the jury's verdict will not be disturbed on appeal where, as here, substantial evidence supports the verdict. Therefore, we conclude that Brown's contention is without merit.

10  #30, Ex. 76, at 4-6 (citation footnotes omitted).

11          The state supreme court's rejection of this claim was neither contrary to nor an

12  unreasonable application of clearly established federal law as determined by the United

13  States Supreme Court.

14          On a challenge to the sufficiency of the evidence, the habeas petitioner faces a

15  "considerable hurdle." *Davis v. Woodford*, 333 F.3d 982, 992 (9th Cir. 2003).  Under the

16  standard announced in *Jackson v. Virginia*, 443 U.S. 307 (1979), the jury's verdict must stand

17  if, after viewing the evidence in the light most favorable to the prosecution, any rational trier

18  of fact could have found the essential elements of the offense beyond a reasonable doubt.

19  *E.g., Davis*, 333 F.3d at 992.  Accordingly, the reviewing court, when faced with a record of

20  historical facts that supports conflicting inferences, must presume that the trier of fact

21  resolved any such conflicts in favor of the prosecution and defer to that resolution, even if the

22  resolution by the state court trier of fact of specific conflicts does not affirmatively appear in

23  the record. *Id.* The *Jackson* standard is applied with reference to the substantive elements

24  of the criminal offense as defined by state law. *E.g., Davis*, 333 F.3d at 992.  When the

25  deferential standards of the AEDPA and *Jackson* are applied together, the question for

26  decision on federal habeas review thus becomes one of whether the state supreme court's

27  decision unreasonably applied the *Jackson* standard to the evidence at trial. *See,e.g., Juan*

28  *H. v. Allen*, 408 F.3d 1262, 1274-75 (9th Cir. 2005).  Thus, when a federal court assesses a

1  sufficiency of the evidence challenge to a state conviction under AEDPA, "there is a double
2  dose of deference that can rarely be surmounted." *Boyer v. Belleque*, 659 F.3d 957, 964 (9th
3  Cir. 2011).

4       Petitioner relies, first, on his own self-serving statements maintaining that he had been
5  having a consensual sexual relationship with Coates and that he had consensual sex with her
6  on March 21, 2000.  A suggestion that self-serving statements by the defendant on trial
7  render the State's evidence insufficient to sustain a conviction would be risible.  The conflict
8  between Coates' account and Brown's account was a matter to be considered and resolved
9  by the jury.  That is bedrock law on this issue.  The jury accepted Coates' account over
10 Brown's account.  That is the end of that matter.

11      Petitioner urges, second, that Coates' injuries were not consistent with a frying pan
12 being broken over her head because she did not suffer any broken bones and did not have
13 a concussion.  He contends that his injuries – allegedly a confirmed knot over his eyebrow –
14 instead were consistent with Coates hitting him with the frying pan.  Petitioner posits that the
15 broken frying pan was consistent with his story that he threw the pan after hitting Coates
16 because "[t]he pan likely broke upon impact against a wall or the floor."[67]

17      Petitioner points to no evidence – as opposed to bald supposition – that the injuries
18 that Coates sustained were not consistent with a frying pan being broken over her head.
19 Moreover, Coates testified only that she woke up to being hit in the head with the frying pan
20 and thereafter saw Brown sitting on the coffee table with the piece of the frying pan with the
21 handle in his hand.[68]  Her testimony did not establish what Brown hit before she woke up,
22 when he hit what he hit, how he hit what he hit, and/or how many times he hit what he hit
23 before she woke up.  Nor did her testimony establish specifically when the frying pan broke
24 and on what it broke.  She simply woke to being hit in the head with a frying pan that she
25 thereafter observed was broken.  Petitioner thus relies on nothing more than supposition both

26
27      [67]#80, at 25-26.
28      [68]See text and record cites, *supra*, at 3.

-22-

1    that: (a) the frying pan broke in two specifically when striking Coates in the head before she

2    woke up; and (b) if Brown hit her head in some manner that broke the frying pan, he could do

3    so only by also fracturing her skull and causing a concussion.  Petitioner's bald supposition

4    constitutes neither medical nor metallurgical evidence -- much less evidence combining both

5    disciplines -- tending to establish what was and was not physically possible with regard to

6    what medical injuries might be associated with what damage to the particular frying pan used

7    under various possible scenarios.

8         The State of course had the burden of proof.  However, the State discharged that

9    burden, amply, with testimony by Coates that she woke up to being beaten by Brown with a

10   frying pan, which she then observed had split in two, and that he then forcibly raped her while

11   threatening to kill her if she did not comply.  To carry its burden of proof, the State was not

12   required to negate every *post hoc* unsubstantiated supposition by counsel as to what

13   allegedly necessarily would or would not happen to either the victim or the instrument used

14   when someone attacked a sleeping victim with a particular frying pan.[69]

15        Petitioner contends, third, that alleged inconsistencies between Coates' trial testimony

16   and her prior statement to Detective Love rendered the evidence insufficient.

17        At the outset, a number of the alleged inconsistencies relied upon by Petitioner are at

18   best strained on their face.

19        Petitioner maintains that alleged statements to the detective that there was absolutely

20   no altercation between Coates and Brown and no motivating event for the sexual assault was

21   inconsistent with Coates trial testimony that Brown was partying loudly the night before and

22

23        _____

24        [69]While the point is a collateral one, the actual evidence at trial does not support the assertion that
     Brown had "a confirmed knot over his eyebrow" that was consistent with Brown's account that Coates hit him
     with the frying pan.  Detective Love testified only that Brown showed her "a bump" almost a month after the

25   incident, that she did not observe any bruising at that time, and that she did not know the source of the bump.
     See text and record cites, *supra*, at 12.  Merely because the prosecution does not affirmatively negate every
     unsubstantiated and/or speculative assertion that defense and/or federal habeas counsel may postulate does

26   not signify that the State's case was based on speculation.  Coates testified that Brown brutally attacked and
     then raped her.  Her testimony was more than sufficient to sustain the conviction, and was not grounded in

27   speculation as to what happened, from the point that she woke up while being beaten by Brown with a frying
     pan and thereafter was forcibly raped.

28

1   sat next to Coates on the bed while she was sleeping.  An *arguendo* statement that there was

2   no "altercation" the night before and no motivating event is not at all necessarily inconsistent

3   with testimony that Brown was loud the night before and startled Coates by sitting next to her

4   on the bed while she slept.  Assuming, *arguendo*, that the word "altercation" was the word

5   actually used in Coates' statement, Coates easily could have construed the word to mean

6   "fight."  She did not have a fight *per se* with Brown the night before; she yelled at him when

7   she woke up to him sitting by her.  Moreover, nothing in that incident remotely provided a

8   "motivating event" for Brown to brutally attack and then rape Coates.[70]

9        Petitioner next maintains that Coates told the detective that "she was laying on her

10  back with her arm over her face" but testified instead at trial that "she was lying on her side,

11  with her hand over her face."  Petitioner urges that this distinction is important "because

12  Brown would not have been able to hit Coates in the back of the head with the pan if she was

13  lying on her back at the time."[71]

14       Petitioner overstates the clarity of the trial testimony, by both witnesses, as to the

15  actual positioning of Coates' head.  While Coates testified that her back -- more or less -- was

16  facing outward from the couch, the trial transcript reflects that she demonstrated the position

17  of her body and specifically of her head more than describing it clearly in words.[72]  Detective

18  Love, in turn, testified – only from recollection – initially that Coates "said she was laying on

19  her back and that her arm was over her face."  Per counsel's request, she demonstrated that

21  [70]Indeed, Coates testified on cross that there was no "altercation" before she went to bed. #29, Ex.
22  55, at 88; see also #29, Ex. 55, at 85 (defense counsel asks about "a physical altercation, by that I mean
    fight").  Because of the trial court ruling allowing the defense to cross-examine the detective on Coates'
23  statement without having cross-examined Coates on the points, the trial record often contains only defense
    counsel's characterization of the statements.  The detective pointed out that she had not reviewed the victim's
24  statement in preparing for her testimony because she was not expecting to testify as to the statement. #29,
    Ex. 57, at 190.  While counsel on occasion provided her a copy of the statement to refresh her recollection,
25  counsel did not do so as to all of the questions asked.  The State could have recalled Coates per the ruling,
    but such a move  would have allowed the defense a windfall cross-examination opportunity that a prosecutor
26  could have concluded was not worth allowing in order to address collateral points.

27  [71]#80, at 26.

28  [72]#29, Ex. 55, at 37, lines 15-19; 99, lines 17-24; & 100.

1  "I believe she was like this."  Love then testified that "that's how I demonstrated," and that "I

2  couldn't tell your from memory how she demonstrated it, though."  The detective testified that

3  Coates was "laying on her back a little bit propped up on a pillow," and agreed with a leading

4  question that she "*otherwise* was on her back, flat on her back."[73]

5          The record does not affirmatively demonstrate that testimony by Coates, *inter alia*, that

6  "[n]o, it wasn't on my back, it was on my side, but not exactly on my back" and "I was laying

7  exactly like this right here, this"[74] necessarily is inconsistent with testimony by Detective Love

8  that "I believe she was like this."  The trial transcript before this Court on federal habeas

9  review does not establish that Coates told Detective Love in the first instance that her *head*

10  was in a position where she could not have been struck in the back of the head by the frying

11  pan.  The necessary predicate that her statement suggested that Coates was in a position

12  that ruled out being struck in the back of the head is not supported by the trial record.  Nor

13  does the trial evidentiary record establish that the physical demonstration given by Coates at

14  trial differed either from what she actually said[75] to Love and/or from Love's own

15  demonstration.  Petitioner's supposition that Coates' statement to Detective Love necessarily

16  would rule out the prospect of her being hit in the back of the head thus simply is not

17  supported by the trial record.

18          Moreover, Coates testified that she did not know how many times that she may have

19  been hit, woke up, blacked out, and then woke up again while still being hit.[76]  Under *Jackson*,

20  reasonable jurors readily could reach a natural and very permissible inference that a victim

21  being beaten with a frying pan while asleep might not be able to definitively and conclusively

22

23          [73]#29, Ex. 57, at 188-89.

24          [74]*Id.*., Ex. 55, at 99-100.

25          [75]See note 70, *supra*.  Detective Love was not presented with a transcript of Coates' statement on
26  this point and then asked questions about the other witness' statement.  She was testifying "cold" based on
    recollection and leading questioning.  There perhaps is a reason why evidence rules instead require that the
27  witness who allegedly made the inconsistent statement be the one subject to cross-examination regarding the
    statement.

28          [76]#29, Ex. 55, at 97-98.

1  establish the exact positioning of her head at all points during such a process, whether while
2  asleep, temporarily knocked unconscious and/or dazed while being hit.

3       Petitioner further maintains that "Coates provided inconsistent testimony on the issue
4  of . . . whether Brown went through her purse looking for condoms (ex. 57, p. 198)."[77]
5  Petitioner cites in the foregoing to testimony by Detective Love on cross-examination.
6  Petitioner does not cite to any trial testimony by *Coates* – one way or the other – regarding
7  Brown going through her purse looking for condoms.  The Court could find no such trial
8  testimony by Coates.  Obviously, an alleged inconsistency that does not even exist in the trial
9  record cannot provide a viable basis for challenging the sufficiency of the evidence even if the
10 Court were to indulge an *arguendo* assumption that such an alleged inconsistency could
11 render the evidence insufficient in the first instance.[78]

12      Neither the foregoing nor the remaining alleged inconsistencies relied upon by
13 Petitioner – regarding, *e.g.*, where clothes were removed and when Coates first saw Brown
14 holding the knife – rendered the extensive inculpatory testimony sustaining the conviction
15 insufficient to sustain the conviction.  The testimony of both the sexual assault nurse and the
16 detective reflected that Coates was rational yet traumatized after the attack and rape.  The
17 nurse testified that Coates was coherent but her account was disjointed at times as to what
18 happened specifically in what order, which was not uncommon for victims of an attack.[79]  The
19 remaining alleged inconsistencies relied upon herein were explored in cross-examination of
20 the detective and weighed by the jury in the context of the remaining evidence.  Under well-
21 established law, a court reviewing the sufficiency of the evidence under the *Jackson* standard
22 must presume that the jury resolved all such inconsistencies in favor of the prosecution.

23      Petitioner contends, fourth, that "Coates testified that she 'resisted the whole time'
24 while Brown was sexually assaulted her, however there were no injuries supporting such

---

26 [77]#80, at 26.

27 [78]See also text and record cites, *supra*, at 10 (detective's testimony on redirect).

28 [79]See text, *supra*, at 9-10.

testimony." Petitioner misstates the trial testimony. Coates testified that she resisted Brown in the context of testimony that she resisted his efforts to molest her on the couch, to remove her clothes, and to move her from the couch to the bedroom.[80] The bruises and abrasions on her arms were consistent with her resistance, over and above the substantial injuries that she sustained at the very outset of the attack.[81] The absence of injury to which Petitioner apparently refers is the absence of vaginal injury from Brown's sexual penetration.[82] By that point, Brown had hit Coates on the head and face an indeterminate number of times, repeatedly threatened to kill her if she did not comply with his demands, and forcibly held and then moved her about by the arms. As the sexual assault nurse testified, a rape victim often would not exhibit trauma from sexual penetration in circumstances where they simply were trying to stay alive by the time of the actual sexual penetration.[83] Petitioner's suggestion – that Coates' testimony that she resisted and did not consent to having sex with Brown was inconsistent with medical testimony that she sustained no vaginal injury after having been brutally attacked and threatened with death prior to being raped – has nil persuasive force, whether under the *Jackson* standard or otherwise.

The proposition that there was insufficient evidence of forcible sexual assault in this case is wholly without merit. There is no good faith argument on the facts of this case that the trial evidence was insufficient to sustain Brown's conviction on three counts of sexual assault – whether on a *de novo* review or most assuredly on deferential AEDPA review. Petitioner presents – at the exceeding level best – conflicts in the evidence coupled with bald speculation as to the circumstances under which a particular frying pan necessarily would split on impact. It is established beyond all peradventure that conflicts in the evidence and competing inferences to be drawn from the evidence do not render the evidence insufficient

---

[80]See text and record cites, *supra*, at 3-4.

[81]*Id.*, at 6-7.

[82]*Id.*, at 8.

[83]*Id.*

1  to convict under the *Jackson* standard.  Nor must the State negate every unsupported *post*

2  *hoc* speculative supposition advanced by a defendant.  Merely reurging debating points from

3  a defense closing argument does not set forth a viable claim of insufficiency of the evidence.

4  There, again, simply is no good faith argument on the facts of this case that the evidence at

5  trial was constitutionally insufficient to sustain a conviction for sexual assault.

6       Ground 3 therefore does not provide a basis for federal habeas relief, as the evidence

7  indisputably was sufficient to sustain a conviction under *Jackson v. Virginia*.

8       ***Ground 1(B):  Effective Assistance at Trial – Unfavorable Defense Witness***

9       In Ground 1(B),[84] Petitioner alleges that he was denied effective assistance of trial

10  counsel in violation of the Sixth and Fourteenth Amendments when defense counsel called

11  a witness, Kathryn Uhrich, who allegedly only bolstered the State's case.

12       The Court summarized Uhrich's testimony, *supra*, at 17-18.[85]

13       The state district court concluded that trial counsel rendered deficient performance in

14  calling Uhrich.  The state courts held, however, that Petitioner did not demonstrate the

15  requisite prejudice to sustain a claim of ineffective assistance of counsel.

16       The Supreme Court of Nevada held in particular as follows:

> . . . Brown claims that trial counsel was ineffective for calling a defense witness who bolstered the State's case.  Brown fails to demonstrate that he was prejudiced.  At trial, the defense called Kathryn Uhrich as a witness in an attempt to show that Brown and the victim had a preexisting loving relationship.  However, Uhrich testified that the victim did not like Brown.  The district court found that Uhrich's testimony "did not help put forward [Brown's] theory that he and the victim had a loving relationship."  However, despite concluding that counsel's performance was deficient, the district court found that Brown failed to demonstrate prejudice.  We agree that in light of the evidence presented at trial, Brown fails to demonstrate that but for this brief testimony, there was a reasonable probability of a different result at trial.  Therefore, the district court did not err in denying this claim.

25  #31, Ex. 117, at 4.

26  _____

27      [84]The Court dismissed Grounds 1(A) and (H) as untimely.

28      [85]See also #31, Ex. 96, at 9-13 & 61-62 (counsel's testimony at the state court evidentiary hearing).

-28-

1    The state courts' rejection of this claim – for absence of the requisite prejudice – was

2    neither contrary to nor an unreasonable application of clearly established federal law.

3    On a claim of ineffective assistance of counsel, a petitioner must satisfy the

4    two-pronged test of *Strickland v. Washington*, 466 U.S. 668 (1984).  He must demonstrate

5    that: (1) counsel's performance fell below an objective standard of reasonableness; and (2)

6    counsel's defective performance caused actual prejudice.  On the performance prong, the

7    issue is not what counsel might have done differently but rather is whether counsel's

8    decisions were reasonable from her perspective at the time.  The  court starts from a strong

9    presumption that counsel's conduct fell within the wide range of reasonable conduct.  On the

10   prejudice prong, the petitioner must demonstrate a reasonable probability that, but for

11   counsel's unprofessional errors, the result of the proceeding would have been different.  *E.g.,*

12   *Beardslee v. Woodford*, 327 F.3d 799, 807-08 (9th Cir. 2003).

13   This Court cannot say that it might not have reached the same conclusion as the

14   Supreme Court of Nevada on a *de novo* review.

15   To be sure, the case turned to a not insignificant degree on an assessment of the

16   relative credibility of the accounts by Coates and Brown as to what actually occurred inside

17   the apartment on the morning in question.  However, Coates immediately called 911 and

18   reported the rape after running from the apartment and then immediately called her mother.

19   She exhibited not only significant injuries to her head and face, including an eye that was

20   swelling shut as she was being examined, but also had contusions and bruises on her arms

21   that were consistent with her account of Brown holding and/or directing her forcibly by her arm

22   or arms at several points.  Professionals – as opposed to a bystander called by the defense

23   who saw Coates only from one side briefly from a distance – who examined Coates

24   immediately after the attack observed a traumatized, crying and distraught young woman who

25   was coherent but nonetheless slightly "scattered" by the trauma when describing the events.[86]

26   / / / /

27   _____

28   [86]See text and record cites, *supra*, at 5-10.

-29-

1    Brown, in contrast, instead immediately fled after the attack, and his self-serving

2    account nearly a month later after being apprehended hardly resonates with credibility even

3    on a cold record.  Brown's account included embellishments that did not fit the time line

4    and/or that otherwise strained credulity.  These included allegedly taking Stadler and Coates

5    out to a special dinner the evening before, allegedly following Coates to the Subway after the

6    attack at a time when paramedics instead already were being dispatched to a nearby

7    apartment following her 911 call, and his assertion that two female employees lied about his

8    being in the Subway the following day because one of them was having a lesbian relationship

9    with Stadler.  His account otherwise reads as an over-the-top fantasy where Coates allegedly

10   had been bringing multiple males to the apartment and having sex with them on the floor but

11   also was accusing him of rape because she wanted him to leave her mother for her because

12   no one else allegedly could satisfy her the way that he did.  Brown made these assertions

13   after immediately fleeing from apprehension, ultimately leaving the state altogether, and

14   thereafter lying to officers in Michigan regarding his identity.[87]

15       The Court thus cannot say that it would not have reached the same conclusion on a

16   de novo review that there was not a reasonable probability that, but for trial counsel's deficient

17   performance in calling Uhrich, the result of the trial would have been different.  Even if this

18   Court would have reached a different conclusion, it may not grant habeas relief merely

19   because it may believe that the state court decision was incorrect.  Rather, "[a] state court's

20

21       [87]Respondents further point to defense counsel's reliance upon Uhrich's testimony in closing as being

22   inconsistent with an alleged statement by Coates to Detective Love that Brown had made no prior sexual
     advances other than the incident where Brown kissed her on the mouth.  Defense counsel relied upon this

23   alleged inconsistency as part of a general argument attacking Coates' credibility.  See #29, Ex. 59, at 55-56.
     While that may have been what counsel argued, the Court has not been able to locate any reference in

24   Detective Love's testimony that Coates made a prior statement in that regard.  It therefore appears that
     defense counsel was arguing based upon facts not actually in evidence.  In any event, any such alleged

25   inconsistency hardly carries any substantial weight in weighing the probabilities at trial.  What Uhrich
     characterized as "sexual advances" in her testimony may well have corresponded to the uncomfortable looks

26   to which Coates in fact did testify. #29, Ex. 55, at 125.  Lawyers perhaps attach far more significance than do
     jurors, or judges, to such dubious cross-witness "impeachment" on collateral points that may turn on little

27   more than the inexact terminology used by different witnesses and/or different witnesses' differing recollection
     as to hearsay from long before trial.  This collateral use of Uhrich's testimony by trial counsel in her closing

28   argument does not have any significant bearing on this Court's analysis of prejudice under Strickland in this
     case, one way or the other.

1    determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded

2    jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*,

3    131 S.Ct. 770, 786 (2011).  Petitioner has not demonstrated that the state supreme court's

4    rejection of his claim under the prejudice prong of *Strickland* was objectively unreasonable

5    under this deferential standard of review.[88]

6            Ground 1(B) therefore does not provide a basis for federal habeas relief.

7            ***Ground 1(C):  Effective Assistance – Evidence of Prior Confrontation***

8            In Ground 1(C), Brown alleges that he was denied effective assistance of trial counsel

9    when defense counsel elicited testimony regarding a prior confrontation between Brown and

10   the victim where Brown allegedly attempted to kiss the victim and they fought one another.

11           The Court summarized the trial testimony relevant to this claim, *supra*, at 14-15.

12           At the state post-conviction evidentiary hearing, defense counsel testified that she

13   made a strategic decision to elicit the testimony because she wanted to use the testimony to

14   suggest that Brown and Coates had a volatile – but romantically volatile – relationship prior

15   to the alleged attack.  That is, she sought to portray the incident as in fact a thinly-veiled

16   lover's quarrel that broke out while the two actually were in the presence of Stadler.[89]

17           The Supreme Court of Nevada rejected the claim presented to that court on the

18   following grounds:

19                    . . . Brown claims that trial counsel was ineffective for
                opening the door to evidence of a prior confrontation between
20              Brown and the victim. Brown fails to demonstrate that trial
                counsel's performance was deficient or that he was prejudiced.

21

22           [88]Petitioner essentially rehashes the point that Uhrich's testimony corroborated the State's case and
23   did not help the defense case.  Deficient performance rarely will be helpful to the defense.  *Strickland* requires
     that the deficient performance be harmful to the point of there being a reasonable probability of a different
24   outcome but for the deficient performance.  Petitioner has not demonstrated prejudice under that standard on
     the facts presented.  *Strickland* clearly does not establish an essentially one-prong test where demonstration
25   of deficient performance automatically establishes resulting prejudice to the requisite degree.  To the extent,
     if any, that Uhrich's testimony undermined the testimony of the other defense witness, Mary Cyronek, as
26   argued by Petitioner, the allegedly undermined testimony itself was not of substantial significance.  See text
     and record cites, *supra*, at 15-18.  There is not a reasonable probability that the outcome of the case turned
27   on the testimony elicited from either witness, whether singly or collectively.

28           [89]#30, Ex. 94, at 16-20; #31, Ex. 96, at 3-8, 43-48 & 57-58.

1
2
3
4
5
6
7
8
9
10

During cross-examination of the victim, trial counsel elicited testimony that Brown had previously tried to kiss the victim, she had then struck him, he struck her back, and the police were called. No one was arrested. The record reflects, and the district court found, that trial counsel made a tactical decision to elicit this testimony in order to show a pattern of fighting followed by consensual contact. In the context of claims of ineffective assistance of counsel, "`a tactical decision . . . is virtually unchallengeable absent extraordinary circumstances.'" Foster v. State, 121 Nev. 165, 170, 111 P.3d 1083, 1087 (2005) (quoting Doleman v. State, 112 Nev. 843, 848, 921 P.2d 278, 280-81 (1996)) (internal quotation marks omitted). Brown has not demonstrated extraordinary circumstances here. Moreover, defense counsel testified that "still was not certain that the facts of that prior incident as revealed to the jury was actually damaging to the defendant." Brown fails to demonstrate that, but for trial counsel's elicitation of this incident, there is a reasonable probability that the result of trial would have been different. Therefore, the district court did not err in denying this claim.

11   #31, Ex. 117, at 3-4.

12        The state supreme court's rejection of this claim was neither contrary to nor an

13   unreasonable application of *Strickland*.

14        While surmounting *Strickland*'s high bar is "never an easy task," federal habeas review

15   is "doubly deferential" on the performance prong in a case governed by the AEDPA.  In such

16   cases, the reviewing court must take a "highly deferential" look at counsel's performance

17   through the also "highly deferential" lens of § 2254(d).  *Pinholster*, 131 S.Ct. at 1403 & 1410.

18        As the Supreme Court explained in *Pinholster*:

19
20
21

    In *Strickland*, . . . [t]he Court acknowledged that "[t]here are countless ways to provide effective assistance in any given case," and that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Id.*, at 689, 104 S.Ct. 2052.

22
23
24
25
26
27
28

    Recognizing the "tempt[ation] for a defendant to second-guess counsel's assistance after conviction or adverse sentence," *ibid.*, the Court established that counsel should be "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," *id.*, at 690, 104 S.Ct. 2052. To overcome that presumption, a defendant must show that counsel failed to act "reasonabl[y] considering all the circumstances." *Id.*, at 688, 104 S.Ct. 2052.  The Court cautioned that "[t]he availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges."  *Id.*, at 690, 104 S.Ct. 2052.

1              . . . . .

2          The [reviewing court must not overlook] "the
   constitutionally protected independence of counsel and ... the
3   wide latitude counsel must have in making tactical decisions."
   466 U.S., at 689, 104 S.Ct. 2052. Beyond the general
4   requirement of reasonableness, "specific guidelines are not
   appropriate." *Id.*, at 688, 104 S.Ct. 2052. "No particular set of
5   detailed rules for counsel's conduct can satisfactorily take
   account of the variety of circumstances faced by defense counsel
6   or the range of legitimate decisions ...." *Id.*, at 688–689, 104
   S.Ct. 2052. *Strickland* itself rejected the notion that the same
7   investigation will be required in every case. *Id.*, at 691, 104 S.Ct.
   2052 ("[C]ounsel has a duty to make reasonable investigations or
8   to make a reasonable decision that makes particular
   investigations unnecessary" (emphasis added)). It is "[r]are" that
9   constitutionally competent representation will require "any one
   technique or approach." [*Harrington v. Richter*, 562 U.S. ——,
10   ——, 131 S.Ct. 770, 779, 178 L.Ed.2d 624 (2011)] . . . . .

11          . . . . *Strickland* specifically commands that a court "must
   indulge [the] strong presumption" that counsel "made all
12   significant decisions in the exercise of reasonable professional
   judgment." 466 U.S., at 689–690, 104 S.Ct. 2052. The
13   [reviewing court is] required not simply to "give [the] attorneys the
   benefit of the doubt," . . . but to affirmatively entertain the range
14   of possible "reasons . . . counsel may have had for proceeding as
   they did" . . . .

15

16   *Pinholster*, 131 S.Ct. at 1403 & 1407.

17          Petitioner contends that counsel made the tactical decision without making an

18   adequate investigation of the prior incident because she allegedly did not review the police

19   report from the prior incident. He alleges that counsel so testified at the state post-conviction

20   evidentiary hearing. Petitioner maintains that a tactical decision made without adequate

21   investigation is not entitled to deference under *Strickland*. He contends that the state courts'

22   rejection of the claim thus both was based upon an unreasonable determination of fact and

23   was an objectively unreasonable of *Strickland*.

24          Petitioner's argument is not supported by the entire testimony presented. Trial counsel

25   had only an incomplete independent recollection of the trial by the time of the evidentiary

26   hearing. The hearing transcripts are replete with instances where counsel stated that she did

27   not recall or remember the point in question or only "believed" or "thought" that some fact was

28   correct. She had not independently reviewed the trial transcript or other materials from the

-33-

criminal case beforehand to refresh her recollection.  On a number of points, what she

purportedly did "recall" at the evidentiary hearing was based upon what *state post-conviction*

*counsel* had told her about the case either in a recent meeting about the case and/or while

she then was on the stand.  In short, trial counsel's testimony was to an extent "coached"

based upon what a lawyer representing one side of the post-conviction case had told her had

happened.[90]

This point is critical – on a number of claims discussed herein, including this one –

because what state post-conviction counsel told trial counsel well after the fact was belied by

the record on a number of points.  Trial counsel thus on occasion was speaking based upon

assumptions as to what she did or did not do and/or the consequences thereof that were not

supported by the actual historical record as opposed to what state post-conviction counsel

had told her had happened.

On direct at the evidentiary hearing, trial counsel proceeded on assumptions, supplied

by state post-conviction counsel, that: (a) she had elicited testimony as to the prior incident

without having read the police report and being familiar with the particulars; and (b) the State

thereafter was able to introduce additional significantly prejudicial particulars regarding the

incident of which she allegedly had been unaware due to an incomplete investigation.[91]  On

cross-examination, however, it was established that trial counsel in fact had defended Brown

_____

[90]See, from direct and redirect, #30, Ex. 94, at 10, lines 14-19; 12, line 25; 13, lines 7 & 16; 16, line 15 (referring to what counsel had told her); 17, lines 8 & 20-21 (referring to what counsel had told her); 18, lines 9-11 & 15-18; 19, lines 7 & 10; 20, line 20; #31, Ex. 96, at 3, lines 5-7; 4, line 5; 5, lines 2-7; 6, lines 6, 14 & 22-23; 7, lines 7 & 20-23; 8, lines 2-25 ("I remember it slightly, 'cause you brought it up to me . . . you talked to me about it prior to the – this hearing"); 9, lines 3-25 ("If you say so, yes."); 10, lines 3-22 (then recollection thereafter refreshed by document); 12, lines 8-23; 13, line 8-24; 15, lines 11-23 ("That makes sense, but I don't remember."); 18, lines 23-25; 19, at lines 10-11 (. . . perhaps.  Is that what you're saying?"); 20, at lines 7, 10-12, 18-25; 21, lines 1-4 & 14-19 ("If you say so . . . .")(recollection refreshed by document); 23, lines 18-20; 24, lines 4-9 & 24; 25, lines 2-9; 26, lines 7-24; 27, lines1-27 (recollection, partially, refreshed by document); 28, lines 5-24; 29, lines 2-25; 30, lines 1-23; 31, lines 11-25; 32, lines 1-4 & 32-33; 33, line 1; 35, lines 23-25; 37, at 2-7 ("I don't remember.  You've pointed that out to me . . . .")(recollection refreshed by document); 38, at 7-13 ("Well, actually it's not [after reviewing the actual document] – it's not as bad as what I thought you said originally when you were telling me about it."); 54, lines 1-9 (recollection refreshed by document); 55, lines 4-10; 56, lines 7-19; 57, line 21; and 62, lines 5-12.

[91]#30, Ex. 94, at 16-20; #31, Ex. 96, at 3-8.

on the charges arising from the prior incident in a May 2000 trial prior to the August 2001 trial in the present case.  She therefore was familiar with the particular circumstances of the prior incident at the time of the August 2001 trial.  Counsel's *entire* testimony on the point ultimately led to this conclusion:  "I got into [it] knowingly.  I got into [it] knowingly what this was about, yes.  I got into it because I thought it would not be inconsistent with our defense."[92]

Moreover, the additional particulars that were developed by the State regarding the incident were not necessarily damningly prejudicial in the context of the defense theory being pursued.  On cross at trial, defense counsel elicited testimony that Brown tried to kiss Coates, she slapped him, he hit her, and she and her mother left to call the police at a 7-11.[93]  On redirect, the prosecution elicited details that the confrontation allegedly arose out of an argument between Brown and Coates' mother in which he "mumbled something to her . . . concerning the knife" and Coates confronted him about what he meant to do.  According to Coates, her mother then went into the bathroom as Stadler and Brown continued arguing while ignoring Coates, Brown tried to kiss Coates, she slapped him, and he punched her in the mouth and they fell fighting to the floor with him punching her in the stomach.[94]

At the state court evidentiary hearing, post-conviction counsel generally referred vaguely in his questioning to unspecified prejudicial evidence coming in.  When defense counsel asked state post-conviction counsel what the evidence was, he referred to "the issue where Mr. Brown was alleged to have attacked Mary, Nichole's mother; that he had physically assaulted her."[95]  However, there was no such evidence introduced at trial regarding the prior incident.  There was evidence of Brown mumbling something about a knife in an argument, but no evidence of Brown beating or otherwise physically abusing his wife. And while there was additional information regarding the fight between Brown and Coates, the very point of

---

[92]#31, Ex. 96, at 43-45, 46-47 & 57-58.

[93]#29, Ex. 55, at 88-90.

[94]*Id.*, at 119-25.

[95]#31, Ex. 96, at 7.

the strategy pursued by defense counsel was to try to portray the two as having a history of "both loving and fighting" as described by defense counsel at the hearing.[96]

On federal habeas review, Petitioner urges that the evidence showed that Brown was a bad person and the sole aggressor, supporting the State's case and undermining the defense theory of a mutually tumultuous relationship.  Petitioner ignores the fact that defense counsel elicited the testimony precisely to suggest a tumultuous relationship where Coates and Brown both "fought and loved."  The defense theory was to use the incident to argue that Coates and Brown "fought and loved" in the prior incident just as they did on the day of the alleged attack, where according to Brown's account, they had consensual sex and then had a – similarly – very violent fight where each hit the other with the frying pan.  The additional detail elicited on redirect regarding how violent the prior fight had been added to rather than detracted from that defense theory.

As the Supreme Court has observed, "[t]here are countless ways to provide effective assistance in any given case," and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way."  *Strickland*, 466 U.S. at 689.  Petitioner in the final analysis is engaging in a *post hoc* second-guessing of defense counsel's strategy at trial based on the evidence available to her.  While federal habeas counsel now seeks to draw other inferences from the evidence, defense counsel at the time instead was seeking to draw other inferences consistent with Brown's theory of defense.  She elicited the testimony in an effort to indirectly corroborate Brown's account in which he and Coates allegedly had consensual sex but also then fought one another viciously on the day of the alleged attack.  Strategic choices by trial counsel made after investigation are "virtually unchallengeable."  *Strickland*, 466 U.S. at 690.  The state supreme court's conclusion in this case, *inter alia*, that

---

[96]E.g., #31, Ex. 94, at 3.  The Court notes that defense counsel's initial testimony on direct -- after also having had state post-conviction counsel "refresh" her recollection in a prior meeting – was premised upon misrepresentation of the record by post-conviction counsel.  A reviewing court never is bound on post-conviction review by purported "admissions" of a defense attorney at an evidentiary hearing, especially so when the underlying premises are belied by the record.  In this case, defense counsel was not always given accurate information when she sought to have her recollection refreshed by state post-conviction counsel.

1    trial counsel's strategic decision -- which the full record reflects was made on adequate

2    investigation -- did not constitute deficient performance was based upon neither an

3    unreasonable determination of fact nor an objectively unreasonable application of *Strickland*.

4          Ground 1(C) therefore does not provide a basis for federal habeas relief.[97]

5    ***Ground 1(D):  Effective Assistance – Custodial Status and Threats to Officer***

6          In Ground 1(D), Brown alleges that he was denied effective assistance of trial counsel

7    when defense counsel failed to seek to exclude evidence of his fugitive and custodial status

8    at trial and of his threats to a correctional officer while maintaining his innocence.

9          With regard to custodial status, Petitioner refers to: (a) testimony by a Michigan law

10   enforcement officer as to his apprehension of Brown as part of a multi-agency fugitive task

11   force pursuant to a fugitive warrant; (b) testimony by the investigating detective that she

12   interviewed Brown at the detention center following his arrest in Michigan and extradition to

13   Nevada and further that he would not have been free to leave but would have to return to his

14   cell after the interview; and (c) testimony by a correctional officer regarding statements made

15   by Brown while in custody.[98]

16         With regard to threats, Petitioner refers to threats made to the correctional officer in

17   the course of vehemently maintaining his innocence, including threats to harm his family.[99]

18         The Supreme Court of Nevada rejected the claims presented to that court on the

19   following grounds:

20                    . . . Brown claims that trial counsel was ineffective for
21         failing to preclude evidence of his fugitive status, his violent
           behavior while in custody, and his threats against a correctional
22         officer.  Brown fails to demonstrate that he was prejudiced. With
           regard to the evidence of Brown's fugitive status, this court, has
23         already concluded that it was admissible because it was relevant

---

25   [97]*Strickland* is a two-pronged standard.  If the state supreme court's holding on deficient performance
     withstands review under AEDPA, this Court need not address the prejudice prong.

26
27   [98]See text, *supra*, at 11 & 13 n.55; #29, Ex. 57, at 144-49 (Michigan officer); *id.*, at 150-56 (detention
     center officer); *id.*, at 161-64 & 167-68 (investigating detective).  The Michigan officer was not an FBI agent.

28   [99]#29, Ex. 57, at 150-56.

to demonstrate his consciousness of guilt. Brown v. State, Docket No. 39514 (Order of Affirmance, August 13, 2003). Accordingly, Brown fails to demonstrate that trial counsel was deficient for failing to object to this evidence.

With respect to the testimony of Corrections Officer Steven Young about Brown's violent conduct and threats after being apprehended, the district court concluded that this evidence should have been objected to and should not have come in. Nevertheless, the district court found that Brown had "not shown that but for said errors, there was a reasonable probability that he would have been acquitted at trial." The trial record reflects that Officer Young's testimony was brief and the prosecutor never asked Officer Young to elaborate on his statements. And Officer Young confirmed that Brown had maintained his story that the sexual encounter with the victim was consensual. Officer Young's testimony in this regard supported the defense theory at trial. In light of the evidence presented at trial, including the victim's testimony, her 911 call, documentation of her physical injuries, and Brown's subsequent flight to Michigan, Brown fails to demonstrate that objection to the testimony had a reasonable probability of resulting in his acquittal. Therefore, the district court did not err in denying this claim.

#31, Ex. 117, at 2-3.

Petitioner has not demonstrated that the state supreme court's rejection of the claim pertaining to the references to his fugitive and custodial status – as not constituting deficient performance – was contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

Petitioner points to the fact that the state supreme court referred explicitly only to the aspect of the claim regarding his fugitive status.[100] The state high court implicitly rejected, however, his exhausted claim as well regarding the references to his custodial status. Petitioner does not point to any decisions of the United States Supreme Court that would require that the state supreme court conclude that defense counsel failed to raise a meritorious objection. The United States Supreme Court holdings to date address only

_____

[100]The Court would note in this regard that it was necessary to establish that the officers in Michigan were seeking to execute a fugitive warrant on Brown in order to lay the predicate for the admission of his attempt to avoid apprehension by lying about his identity. Merely establishing that he lied about who he was to a number of individuals who happened to be at his sister's house that day would not have laid the required predicate. To that extent, the references to fugitive status and warrants was part and parcel of the flight evidence. Fleeing or seeking to avoid apprehension by officers seeking to take the defendant into custody clearly is admissible evidence rather than any impermissible reference to fugitive and/or custodial status.

-38-

presence at trial in prison garb.  Petitioner relies upon a number of federal appellate opinions in regard to references to custodial status, but a federal court of appeals is not the United States Supreme Court.  Citation to decisions from other state courts fail to satisfy Petitioner's burden under AEDPA for the same reason.  The state supreme court's implicit conclusion that an objection on the facts presented in this particular case would not have been a meritorious objection that should have been raised by counsel under its own state law precedents is a matter as to which that court is the final arbiter.

Petitioner further has not demonstrated that the state supreme court's rejection of the claim pertaining to the threats to the correctional officer – under the prejudice prong of *Strickland* – was contrary to or an unreasonable application of clearly established federal law.

Against the backdrop of the trial evidence, the state supreme court's conclusion that there was not a reasonable probability that an objection to the testimony would have resulted in a different outcome at trial was not an objectively unreasonable application of *Strickland*.[101] Petitioner urges that he has established the requisite prejudice because the evidence allegedly constituted improper propensity evidence.  Merely rehashing the point that the evidence allegedly should not have been admitted in the first instance does not establish that the *Strickland* prejudice standard has been satisfied.  Moreover, as Petitioner acknowledges, the United States Supreme Court has not held as yet that the introduction of propensity evidence violates due process.  *See,e.g., Alberni v. McDaniel*, 458 F.3d 860, 863-67 (9th Cir. 2006).  Again, however, merely establishing that evidence allegedly was inadmissible, whether on federal constitutional or state law grounds, but was not objected to does not automatically establish prejudice under *Strickland*.  The *Strickland* standard, again, is a two-pronged standard.  Showing deficient performance, as was found to be present by the state courts, does not in and of itself establish the requisite prejudice.

Ground 1(D) therefore does not provide a basis for federal habeas relief.

---

[101]See text, *supra*, at 1-18 (extensive summary of trial evidence); *id.*, at 29-31 (discussing the trial evidence in addressing prejudice issue on a claim of ineffective assistance of counsel herein).

***Ground 1(E):  Effective Assistance – Cross-Examination of Victim***

In Ground 1(E), Petitioner alleges, in the main, that he was denied effective assistance of trial counsel when counsel elected to not impeach the victim's testimony with prior inconsistent statements during cross-examination and instead developed the inconsistent statements through the testimony of the investigating detective.

The Court summarized the trial testimony relevant to this claim, including the victim's testimony, *supra*, at 2-6 & 9-10.

At the state post-conviction evidentiary hearing, defense counsel testified that she made a strategic decision to develop the victim's prior inconsistencies through the testimony of the investigating detective rather than on cross-examination of the victim.  As defense counsel explained in response to state post-conviction counsel's questions:

> A       Okay. Basically there was no question that Ms. Coates was battered in this case, and I felt like if I could avoid beating her up on the stand and still bring out her lies through another witness, that would be more beneficial to Johnny not to make the jury angry at me for beating up on a person who obviously had been abused, while not sexually abused, but at least abused, and she was a young girl as well, so, and he was an older gentleman.
>
> . . . . .
>
> A       I didn't want to be perceived as beating her up, because I don't – I thought the jury would come to the conclusion that there was a fight between Johnny and Nichole, and certainly he was probably the stronger party.
> . . . .
>
> . . . . .
>
> Q       With regard to Johnny being the stronger party, was there not any time when you felt that you had a defense against the physical contact between them with regard to Nichole being an initial aggressor [based on Brown's statement that Coates attacked him first], or did you discount that?
>
> A       I didn't consider it strongly, because I didn't think the jury would buy that that she was the physical aggressor, number one; and that she – and that he was entitled to self-defense.
>
> . . . . .

1

2   A              No. I just didn't want to be perceived as beating her
    up about it.  I didn't think that they would buy a self-
3   defense for Johnny, but – so I did not think it was
    worthwhile.  I mean, we were trying to beat the rape
4   charge to be quite honest with you [as opposed to a
    battery charge that would be a misdemeanor if not
5   committed in the course of a sexual assault], and so I did
    not think it was worth upsetting the jury for me to beat up
6   this girl who obviously got into a fight with Johnny and
    perhaps got the raw end of it, and I'm – so, I just – that's
    – I hope that answers your question . . . .

7

8   A              Yeah. I didn't think it mattered who I challenged her
    credibility with [regarding prior inconsistent statements],
9   and if I make the jury upset attacking this young girl, it
    could go against Johnny, so that's why I didn't do it.

10                                      . . . .

11  Q              Now in hindsight do you still think that you made the
    right strategy decision with regard to that [after the State
12  criticized the defense in closing argument for not
    challenging Coates directly regarding the inconsistencies]?

13

14  A              I don't know.  I don't know how that weighed.  I
    don't know. I occasionally do that though, try not to attack
15  the – if I feel that there's a victim in the case that's going
    to be sympathetic, sometimes I try to.  I try to avoid an
16  attack upon that victim, so I don't know.  If it hurt Johnny,
    I'm sorry that it happened that way, but I don't know.

17  #30, Ex. 94, at 13-16.  See also #31, Ex. 96, at 16-18 & 34-45 (regarding battery charge); *id.*,

18  at 39-40 & 59-60 (regarding Coates being half the size of Brown, other bases for questioning

19  her character on the evidence, and the use of the inconsistent statements in the defense

20  closing).

21          The Supreme Court of Nevada rejected the claim presented to that court on the

22  following grounds:

23              . . . Brown claims that trial counsel was ineffective for
    failing to adequately cross-examine the victim. Specifically, Brown
24  claims that trial counsel was ineffective for failing to impeach the
    victim with inconsistencies in her prior statements. Brown fails to
25  demonstrate that counsel's performance was deficient or that he
    was prejudiced. Brown's trial counsel testified that she
26  "intentionally brought out the victim's inconsistent statements
    through her examination of Detective Love, rather than by
27  impeaching the victim" as a trial strategy intended to "avoid
    arousing the jury's sympathies for the victim." As stated above, in
28  the context of claims of ineffective assistance of counsel, "`a

-41-

1           tactical decision . . . is virtually unchallengeable absent
2           extraordinary circumstances." Id. Brown has not demonstrated
        extraordinary circumstances here. Moreover, the record reflects
3           that trial counsel "made a very long list for the jury regarding
        every inconsistent statement the victim made during the
4           investigation of the case" and highlighted them in closing
        argument. Thus, Brown fails to demonstrate a reasonable
5           probability that, had trial counsel conducted a more forceful
        cross-examination of the victim, the results of trial would have
6           been different. Therefore, the district court did not err in denying
        this claim.

7   #31, Ex. 117, at 4-5.

8         The state supreme court's rejection of this claim was neither contrary to nor an

9   unreasonable application of *Strickland*.

10         Petitioner contends that "[t]rial counsel admitted at the evidentiary hearing that her

11   strategy might have been unreasonable."[102]  That assertion does not fairly characterize

12   defense counsel's testimony at the evidentiary hearing.  A reviewing court does not second

13   guess trial counsel's decisions after the fact with the benefit of hindsight.  *Post hoc* second

14   guessing based on hindsight – even *arguendo* by trial counsel herself – does not satisfy a

15   petitioner's burden of proof under *Strickland*.  Moreover, reviewing courts are not bound by

16   any such *arguendo* "admission" by defense counsel.  It is abundantly clear that trial counsel

17   made a calculated strategic decision to not evoke further sympathy by the jury for the victim

18   by appearing figuratively to further "beat up" on the victim on the stand.

19         Strategic choices by counsel made after investigation are "virtually unchallengeable."

20   *Strickland*, 466 U.S. at 690.  Petitioner's argument that counsel's "purported strategy was

21   unreasonable" fails to establish that the state supreme court's rejection of this claim was an

22   objectively unreasonable application of the performance prong of the *Strickland* standard.

23         Ground 1(E) therefore does not provide a basis for federal habeas relief.[103]

24

25       [102]#80, at 14.

26

27       [103]As noted previously, *Strickland* is a two-pronged standard.  If the state supreme court's holding on deficient performance withstands review under AEDPA, this Court need not address the prejudice prong.

28   Petitioner further asserts that Coates testified that she resisted but there allegedly were no supporting injuries.  Petitioner does not explain how this assertion relates to this claim.  See also text, *supra*, at 26-27.

***Ground 1(F):  Effective Assistance – Brown's Statement***

In Ground 1(F), Petitioner alleges that he was denied effective assistance of trial counsel when counsel failed to move to suppress his statement to the police on the grounds that he was not competent to voluntarily, knowingly, and intelligently waive his *Miranda* rights.

The content of the statement as presented at trial is summarized in the text, *supra*, at 11-13.

Brown had prior mental health issues but ultimately was found competent to stand trial after a period of time in a mental health facility.

During the trial, the state trial court conducted an on-the-record colloquy with Brown outside the presence of the jury regarding his election as to whether to testify.  During that colloquy, it was noted that Brown had a prior felony conviction for kidnaping as to which the sentence had been fully discharged less than ten years prior to the trial.  The conviction therefore properly could be a subject of inquiry on cross-examination if he testified.  Brown indicated that he would not be testifying because the jury already had his statement and nothing had changed in his account.[104]

At the state post-conviction evidentiary hearing, defense counsel testified as follows regarding her decision to not challenge the admission of the statement:

> Q          Okay.  Given the rambling nature and the lengthy nature of the statement and your knowledge of some mental health issues of Mr. Brown –
>
> A          Uh-huh, yes.
>
> Q          – did you ever consider attempting to suppress some or all of the statement based on those type of issues?
>
> A          Not really, because if – there's other things I regret, but if we were going to trial and consent was our defense, his statement was certainly consistent with that.  The district attorney agreed to redact what I felt were most of the really inflammatory and prejudicial portions of it, but I did not think that Johnny would have – well I didn't want to

---

[104]#29, Ex. 58, at 17-20.

Case 2:10-cv-00407-PMP-GWF   Document 82   Filed 09/24/13   Page 44 of 60

1
2

put him on the stand because of his priors and also wasn't sure he'd make a good witness, so I made a trial strategy decision to let it go into evidence.

3

. . . . .

4
5

Q        So did you feel though that you were stuck with Johnny's statement that if it was out it would have been better or worse for the defense?

6
7
8
9

A        I think – in the grand scheme of this case the statement is better to have come in, 'cause we couldn't have had the consent issue brought before the jury without the opportunity for the State to bring in his priors and also have him on cross-examination.

10

. . . . .

11
12

Q        So is your testimony . . . with regard to the statement itself, you may have had grounds to do a motion to suppress, but you felt it was a strategic decision to bring that statement in?

13
14

A        Yes, that's right.

Q        Is that correct?

15
16
17
18

A        I'm not positive I would have had grounds to suppress it, but I may have because he definitely had mental health issues and it was definitely sort of a rambling statement.  I mean it's, you know, but part of it was coherent, but there were parts that were sort of rambling.  I'm not positive whether or not we would have had anyone to say it was an involun – you know, it was --

19
20

Q        But certainly not raised to the court?

21

A        Exactly.  I – we decided not to raise it, and we may have had it; we may not have.  I didn't check it out.

22

#31, Ex. 96, at 34-36.  See also *id.*, at 47-48 & 52-53.[105]

23

24
25
26
27
28

---

[105]Counsel further  explained that she did not argue self-defense against the battery charge premised upon Brown's account that Coates had been the aggressor.  The charge was a felony only if committed with the intent to commit a sexual assault.  If the jury believed Brown's account and acquitted him of the sexual assault but nonetheless found him guilty of battery based on his account, his maximum exposure on what then would become a misdemeanor charge of battery would be only six months.  He had been detained longer than that prior to trial.  As counsel explained, the defense to the felony battery charge was not self-defense but instead was that "there was consent and therefore no intent to commit sexual assault."  She did not believe that a jury would accept self-defense.  #31, Ex. 96, at 16-18 & 34-36.

-44-

1    The state district court concluded, *inter alia*, that "[m]ental illness is not the equivalent
2    of mental incompetence and Defendant has failed to overcome the presumption that he was
3    sane at the time that he gave his statement."[106]

4    The state supreme court rejected the claim on the post-conviction appeal on the basis
5    that Petitioner had failed to provide any argument in support of the claim demonstrating error
6    in the decision below.[107]

7    Petitioner contends that the Court must look to the state district court decision as the
8    last reasoned decision of the state courts, pursuant to *Ylst v. Nunnemaker*, 501 U.S. 797
9    (1991).  He maintains that the state district court found that trial counsel was ineffective under
10   the totality of the circumstances and that a conclusion that Petitioner did not demonstrate
11   prejudice was an unreasonable application of *Strickland*.

12   Although the Court cited *Ylst v. Nunnemaker* in its pior holding on the exhaustion issue,
13   it is not entirely sanguine that the rule of *Harrington v. Richter, supra*, does not instead apply
14   in this context.   In *Harrington*, the Supreme Court held that a state court decision
15   unaccompanied by a specifically articulated explanation – such as the state supreme court's
16   decision on this claim – is subject to the same standard of deferential review as an articulated
17   decision.  See 131 S.Ct. at 784.

18   It is not clear that the state district court made a specific holding as to this particular
19   claim that trial counsel had rendered deficient performance.  The discussion of "ineffective
20   assistance" under a "totality of the circumstances" analysis is  ambiguous.

21   It would be difficult to conclude on the record presented that trial counsel rendered
22   deficient performance in not seeking to suppress the redacted statement.  Trial counsel quite
23   clearly made a strategic decision to use rather than seek to suppress the statement.
24   Petitioner urges that the strategic decision was not based upon an adequate investigation
25   because counsel did not first investigate whether the statement might be suppressed for lack

26   _____

27   [106]#31, Ex. 99, at 10.

28   [107]See discussion of the procedural history and state supreme court decision in #74, at 3-6.

-45-

1   of competency.  However, "counsel has a duty to make reasonable investigations or to make

2   a reasonable decision *that makes particular investigations unnecessary*."  *Strickland*, 466 U.S.

3   at 691 (emphasis added).  Once counsel made a strategic decision to rely upon the statement

4   even if it perhaps might be subject to potential objection, there was no further need to spend

5   limited preparation time to determine whether a viable objection might be presented.

6   Counsel's strategic decision was based upon the quite common sense point that she would

7   have no other affirmative evidence to present that the sex instead was consensual – short of

8   putting a defendant on the stand with a prior conviction and who in her judgment might be a

9   worse witness on cross-examination (perhaps even on direct) than the statement itself.  A

10  holding that Petitioner had not demonstrated prejudice was not an objectively unreasonable

11  application of *Strickland*.

12          First, as the state district court order suggested, establishing that Brown had a history

13  of mental health issues did not necessarily establish that a motion to suppress would have

14  been successful based on the premise that Brown was not competent at the time to waive his

15  *Miranda* rights.  Findings at one point that Brown was not competent to stand trial did not

16  establish that he was not competent at any and all other points in time.  Moreover, a suspect

17  is not necessarily incompetent merely because he gives a rambling statement.

18          Second, further to the point, Petitioner cannot establish that there was a reasonable

19  probability that the suppression of the statement would have resulted in a different outcome

20  at trial.  Absent the statement, the only account at trial of what happened inside the apartment

21  would have been provided by the victim.  After having reviewed the evidence herein on

22  Petitioner's challenge to the sufficiency of the evidence, including the medical testimony

23  discussing the absence of vaginal trauma, the Court can hardly imagine a quicker route to a

24  conviction on the facts of this case other than by the defense securing the suppression of

25  Brown's statement.  Petitioner's underlying premise apparently is that there was a reasonable

26  probability of a different result at trial had defense counsel instead relied only on

27  inconsistencies in the, clearly battered, victim's statements and the absence specifically of

28  vaginal trauma.  That premise is, at the exceeding best, highly questionable given the

1   evidence at trial.[108]  To be sure, Brown could have taken the stand rather than the defense

2   relying instead on the statement.  The jury then would have learned of Brown's felony

3   conviction and would have been presented with a witness who may well have been a poorer

4   witness than the statement standing alone.

5           Petitioner therefore cannot establish a reasonable probability that the suppression of

6   the statement – if it *arguendo* could have been suppressed in the first instance – would have

7   led to a different outcome at trial, which is the pertinent issue under *Strickland*.

8           The state courts' rejection of this claim accordingly was neither contrary to nor an

9   unreasonable application of *Strickland*.

10          Ground 1(F) therefore does not provide a basis for federal habeas relief.

11          ***Ground 1(G):  Effective Assistance – Cross-Examination of Victim***

12          In Ground 1(G), Petitioner alleges that he was denied effective assistance of trial

13   counsel when counsel failed to ask any followup questions of the victim and the sexual

14   assault examination nurse regarding an alleged inconsistency between the victim's testimony

15   that she resisted and the nurse's testimony that the absence of evidence of vaginal trauma

16   was consistent with a witness who did not resist during the sexual assault itself.

17          The related trial testimony of the victim and the nurse is summarized in the text, *supra*,

18   at 2-5 and 7-9.

19          Neither the state district court decision nor the state supreme court decision provided

20   an articulated rationale for rejecting this specific claim.  Petitioner concedes that *Harrington*

21   *v. Richter, supra*, states the appropriate standard of review on this claim.

22          In *Harrington v. Richter*, the Supreme Court rejected the proposition that a summary

23   rejection of a claim is entitled to less deference on AEDPA review.  The Court held that

24   "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's

25   burden still must be met by showing there was no reasonable basis for the state court to deny

26   relief."  131 S.Ct. at 784.  The Court made it clear that satisfying this burden is every bit as

27   
       _____

28          [108]See also the discussion of Ground 1(G), *infra*.

difficult in a case with a summary denial as it is in a case with a fully-articulated decision:

> If this standard is difficult to meet, that is because it was meant to be.  As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  *Cf. Felker v. Turpin*, 518 U.S. 651, 664, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244).  It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no farther.  Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal.  *Jackson v. Virginia*, 443 U.S. 307, 332, n. 5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment).  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

131 S.Ct. at 786-87.

Under this standard of review, the state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law.

For the convenience of reviewing courts, the Court simply sets forth again what it has stated herein with regard to the alleged "inconsistency" between the testimony of the victim and that by the nurse:

> Petitioner contends, fourth, that "Coates testified that she 'resisted the whole time' while Brown was sexually assaulted her, however there were no injuries supporting such testimony."  Petitioner misstates the trial testimony.  Coates testified that she resisted Brown in the context of testimony that she resisted his efforts to molest her on the couch, to remove her clothes, and to move her from the couch to the bedroom.  The bruises and abrasions on her arms were consistent with her resistance, over and above the substantial injuries that she sustained at the very outset of the attack.  The absence of injury to which Petitioner apparently refers is the absence of vaginal injury from Brown's sexual penetration.  By that point, Brown had hit Coates on the head and face an indeterminate number of times, repeatedly threatened to kill her if she did not comply with his demands, and forcibly held and then moved her about by the arms.  As the sexual assault nurse testified, a rape victim often would not exhibit trauma from sexual penetration in circumstances where they simply were trying to stay alive by the time of the actual

-48-

1
2
3
4

> sexual penetration.   Petitioner's suggestion – that Coates' testimony that she resisted and did not consent to having sex with Brown was inconsistent with medical testimony that she sustained no vaginal injury after having been brutally attacked and threatened with death prior to being raped – has nil persuasive force, whether under the *Jackson* standard or otherwise.

Text, *supra*, at 26-27 (record citation footnotes therein omitted).

5
6
7
8
9

The argument that the victim's testimony was inconsistent with the nurse's testimony has no persuasive force.  Trial counsel did not render deficient performance by not pursuing additional questions regarding an alleged inconsistency that was illusory rather than real.[109] There was not a reasonable probability that pursuing questions of either witness on such an illusory inconsistency would have altered the outcome at trial.

10
11
12

The state courts' rejection of this plainly insubstantial claim without further articulation was neither contrary to nor an objectively unreasonable application of *Strickland*.

13

Ground 1(G) therefore does not provide a basis for federal habeas relief.

14

### Ground 1(I):  Effective Assistance at Trial – Victim Drug Use

15
16
17
18
19
20

In Ground 1(I),[110] Petitioner alleges that he was denied effective assistance of trial counsel when defense counsel failed to adequately develop evidence of the victim's drug use. Petitioner alleges that counsel failed to call the appropriate foundation witness to introduce a toxicology report, failed to request that the sample be retested to determine whether the victim used drugs closer to the time of the assault, and failed to present expert testimony allegedly establishing the impact of the victim's drug use on her perception of the events

21
22
23
24
25
26
27

[109]Nothing in trial counsel's testimony at the state court evidentiary hearing contradicts the conclusion in the text.  As noted previously herein, trial counsel did not have complete recall regarding the case; she  had been "coached" prior to the hearing by state post-conviction counsel; and state post-conviction counsel did not provide completely accurate information to trial counsel as to all areas of inquiry.  See text, *supra*, at 33-34.  In this instance, trial counsel had cross-examined the particular nurse in question in multiple trials and did not recall her cross in the particular case.  State post-conviction counsel sought repeatedly to get counsel to concede that she overlooked or side-stepped an issue, but she repeatedly stated that she did not recall having done so.  See #31, Ex. 96, at 25-27.  State post-conviction counsel did not refresh her recollection at the hearing with any transcript pages reflecting deficient action on her part in this regard.  Neither state post-conviction nor federal habeas counsel have identified what additional questions should have been asked of either witness that would have effectively further developed a purported inconsistency that simply was not there in the first instance.  This claim simply has no basis in underlying fact.

28

[110]The Court dismissed Grounds 1(A) and (H) as untimely.

during the incident.

At trial, Nichole Coates acknowledged having smoked marijuana when she was over at her friend's apartment the evening prior to the attack.  She further acknowledged having used methamphetamine and cocaine previously in the past.  On cross-examination, she testified that "it had been awhile . . . I'd say two to three months" prior to the incident since she had used cocaine.  She testified that she had used methamphetamine "[t]wo days, three days before."[111]

During cross-examination of the sexual assault nurse, defense counsel sought to elicit testimony as to the results of the toxicology lab test results obtained in connection with the examination of Coates after the incident.  The State's hearsay objection was sustained.[112] The defense thereafter did not introduce evidence of the contents of the toxicology report through other means.

The only evidence at trial regarding Coates' drug usage was her testimony that she had smoked marijuana the evening prior to the morning attack, had used methamphetamine two to three days prior to that, and had used cocaine two to three months before the incident. According to the time line reflected by the testimony at trial, Coates had left her friend's apartment approximately nine hours before the attack the next morning.[113]

At the state post-conviction evidentiary hearing, defense counsel lacked complete independent recall with regard to the evidence of drug use at trial.  Throughout the questioning, state post-conviction counsel referred to there having been evidence that Coates had used methamphetamine – not marijuana – prior to the attack, as if that were a fact established by the trial evidence.[114]  No such fact of Coates allegedly being intoxicated on

---

[111]#29, Ex. 55, at 67-68 & 87-88.

[112]*Id.*, Ex. 57, at 26-27.

[113]See text and record cites, *supra*, at 2-6.

[114]See #31, Ex. 96, at 3, lines 1-7; 13-16 (*inter alia*, referring to the possibility of Coates being on

(continued...)

1   methamphetamine at that time of course was established in the actual trial evidence.

2          Defense counsel acknowledged having not being able to introduce the toxicology

3   report through the nurse over the State's hearsay objection when showed the relevant portion

4   of the trial transcript.  Her recollection was that she did not seek to introduce the report

5   through another witness because Coates had admitted drug usage.  She further did not

6   believe that the levels of a drug or drugs would be reflected in the toxicology report.[115]

7          Defense counsel testified on questioning by the State that she did not believe that an

8   attack on Coates' ability to coherently perceive the events based upon a toxicology report and

9   expert testimony would have presented a viable argument based on the evidence at trial.  She

10  testified that the recording of Coates' coherent call to 911, which was played to the jury, would

11  have undercut any such avenue of defense.[116]

12         Petitioner did not present any expert testimony at the state court evidentiary hearing

13  tending to establish that an actual rather than a hypothetical expert in fact would have

14  provided probative testimony that Coates' ability to perceive events at the relevant time was

15  impaired due to drug intoxication at that time.

16         Petitioner did not present any evidence at the hearing tending to establish that, if the

17  laboratory sample had been further tested, it would have established any further relevant and

18  probative evidence regarding the level of drugs in Coates' system at the time of the attack,

19  as a necessary factual predicate for such expert testimony.

20         Nor has Petitioner – on federal habeas review – established even that the excluded

21  toxicology report itself was part of the record on state post-conviction review, which also would

22  appear to have been a necessary factual predicate for any expert testimony.  This Court was

23  unable to locate a record citation in Petitioner's federal filings reflecting that the toxicology

24  ─────────────────

25         [114](...continued)

26  methamphetamine at the time of the 911 call); & 19-20 (referring to "the fact that methamphetamine use was
    there").

27         [115]*Id.*, at 53-55.

28         [116]*Id.*, at 41-42.

report was part of the state post-conviction record.  However, the Court was able to locate in the record from the federal evidentiary hearing on timeliness what appears to be the excluded toxicology report.[117]

The "chemistry" section of the report has three columns – one listing various drugs or drug categories, a second reflecting "negative" or "positive," and a third to the far right under the heading "REFER. RANGE UNITS."  The report appears to reflect[118] "positive" for cocaine, amphetamine, and the active ingredient in marijuana, tetrahydrocannabinol (THC) in the second column.  However, that column shows no quantitative values for how much of each drug was in Coates' system at the time, down perhaps to trace metabolites from prior ingestion.  The third column shows "negative" for all columns, *i.e.*, there is no quantitative value shown for any drug, including the drugs with a "positive" result in the second column.

The toxicology report – even if *arguendo* in the state post-conviction record – therefore would not establish how much of any of the drugs then was in Coates' system, how long prior to the test that she may have done a particular drug or drugs, or how the drug or drugs would have impacted her ability to perceive events at the relevant time.  A subject of course can "fail" a laboratory drug test by having residual amounts in her system even though she has not done a particular drug for an interval prior to the test and is not currently intoxicated on a drug or drugs.  The toxicology report – standing alone without expert testimony – did not establish the parameters required to generate a positive result for that particular report or what having metabolites at that level would mean with regard to either recency of use or effect on perception.

The state district court's findings largely tracked defense counsel's post-conviction testimony as to what she did not do and why with regard to drug use evidence.  The court further concluded that "speculation about what an expert could have said is insufficient to

---

[117]See Hearing Exhibit 11, at Bates 0007.

[118]The Court is reading through what appears to be highlighting on the material, which produces a black image on a photocopied document.

1  establish prejudice" and that Brown had "not shown and cannot show that level of prejudice
2  such that it was reasonably probable the outcome of his trial would have been different."[119]

3  The state supreme court rejected the claim on the post-conviction appeal on the basis
4  that Petitioner had failed to provide any argument in support of the claim demonstrating error
5  in the decision below.[120]

6  As the Court discussed also with regard to Ground 1(F), it is not sanguine that it must
7  look through to the state district court decision under *Ylst v. Nunnemaker, supra,* in this
8  situation rather than apply the rule of *Harrington v. Richter, supra.*

9  Under either approach, the state courts' rejection of this claim was neither contrary to
10 nor an objectively unreasonable application of the prejudice prong of the *Strickland* analysis.
11 Even if the toxicology report excluded at trial *arguendo* was part of the state post-conviction
12 record, Petitioner presented nothing more than supposition that further pursuit of the issue
13 would have developed probative evidence that the victim was intoxicated to a sufficient
14 degree at a relevant time that would have affected her perception to a relevant degree at that
15 time. The cursory toxicology report itself did not constitute such evidence. Petitioner presents
16 nothing more than speculation that an expert could have based a probative opinion based
17 upon either the toxicology report or whatever other evidence might have been developed
18 along with the report. Speculation does not establish prejudice.

19 The state courts' rejection of this claim therefore was neither contrary to nor an
20 unreasonable application of clearly established federal law.

21 Ground 1(I) therefore does not provide a basis for federal habeas relief.

22 ***Ground 2: Joinder of Charges***

23 In Ground 2, Petitioner alleges that he was denied rights to due process of law and a
24 fair trial in violation of the Fifth and Fourteenth Amendments when the sexual assault and
25 battery charges against him were joined with charges of burglary and grand larceny arising

26 _____

27 [119]#31, Ex. 99, at 6 & 10.

28 [120]See discussion of the procedural history and state supreme court decision in #74, at 3-6.

-53-

1    out of his stealing money from the Subway at which he, Stadler, and Coates worked prior to

2    leaving town after the sexual assault.

3          On direct appeal, the Supreme Court of Nevada summarized the evidence on the

4    burglary and grand larceny charges and stated its reasons for rejecting the claim of improper

5    joinder as follows:

6

7              . . . Brown contends that the district court abused its
         discretion in denying his pretrial motion to sever the burglary and
         grand larceny counts from the battery and sexual assault counts
8        because the counts were unrelated.  Brown argues that the
         joinder of the charges was unduly prejudicial, and as a result, he
9        was deprived of his right to a fair trial.  We disagree with Brown's
         contention.

10                              . . . . .

11
              In this case, soon after sexually assaulting his wife's
12       19-year old daughter, Brown called the district manager of the
         Subway where he worked with the victim's mother and told the
13       manager that he would no longer be working there. Brown asked
         for his last paycheck, but was told he needed to wait until payday.
14       Brown proceeded to go to the Subway where he was scheduled
         to work that day. Evidence presented at trial indicated that while
15       Brown's co-workers were busy with the afternoon lunch rush,
         Brown stole the change bag and money from the safe, an amount
16       totaling approximately $600.00. Brown subsequently fled to
         Michigan where he was arrested on a fugitive warrant more than
17       two weeks later.[FN8]

18              We conclude that the district court did not abuse its
         discretion in denying Brown's motion to sever the burglary and
19       grand larceny counts from the battery and sexual assault counts.
         The evidence adduced at trial demonstrates that the offenses
20       "were at the very least 'connected together.'" Moreover, evidence
         of the offenses would be cross-admissible in separate trials to
21       prove motive and intent.  The State's theory was that the burglary
         and grand larceny were clearly linked to the sexual assault and
22       were committed in order to aid Brown's flight from Las Vegas and
         that Brown fled to Michigan in order to avoid future felony charges
23       stemming from the sexual assault. Brown failed to demonstrate
         that joinder of the charges substantially influenced the jury or
24       rendered his trial fundamentally unfair, or that the joinder was
         manifestly prejudicial.   Therefore, we conclude that Brown's
25       contention is without merit.

26              [FN8] Brown claims that he was in Michigan for his
         sister's wedding.  When the Grand Rapids Police
27       Department detective approached Brown upon
         seeing him in his sister's house, both Brown and his
28       sister tried to deceive the detective and identified

-54-

1    him as Jeffrey Brown, his brother.

2    #30, Ex. 76, at 1-4 (statement of legal standards and citation footnotes omitted).

3    The state supreme court's rejection of Petitioner's federal constitutional claim was

4    neither contrary to nor an objectively unreasonable application of clearly established federal

5    law as determined by the United States Supreme Court.

6    Petitioner relies upon *United States v. Lane*, 474 U.S. 438 (1986), which stated in a

7    footnote:

8
         Improper joinder does not, in itself, violate the Constitution.
9        Rather, misjoinder would rise to the level of a constitutional
         violation only if it results in prejudice so great as to deny a
10       defendant his Fifth Amendment right to a fair trial.

11   474 U.S. at 446 n.8.

12   The Ninth Circuit has held that this statement in *Lane* is *dicta* and that it thus does not

13   set forth clearly established law binding on the States on federal habeas review.   *See*

14   *Runningeagle v. Ryan*, 686 F.3d 758, 776-77 (9th Cir. 2012), *cert. denied*, 133 S.Ct. 2766

15   (2013); *Collins v. Runnels*, 603 F.3d 1127, 1132-33 (9th Cir. 2010).

16   The Ninth Circuit's holding eliminates any further need for discussion on this claim.

17   Under controlling Ninth Circuit authority, the August 13, 2003, decision of the Supreme Court

18   of Nevada was neither contrary to nor an unreasonable application of clearly established

19   federal law as determined by the United States Supreme Court at the time of its decision.

20   Ground 2 therefore does not provide a basis for federal habeas relief.[121]

21

22   _____

     [121]The Court further notes the following in passing.  *First*, *Lane* addressed joinder of multiple
23   defendants under Federal Rule of Criminal Procedure 8(b), not joinder of charges against a single defendant.
     Any constitutional joinder holding in that case would not have stated a standard for joinder of charges against
24   a single defendant, which would be the issue here.  *Second*, the more general a constitutional rule, the more
     leeway the states have in applying the rule in case-by-case determinations when later reviewed under
25   AEDPA.  *Harrington v. Richter*, 131 S.Ct. at 786.  *Third*, Petitioner's reliance on lower federal court decisions,
     including in particular cases applying federal criminal procedure rules or decided well before AEDPA, is
26   wholly unavailing.  This Court is not engaging in a *de novo* review of the Supreme Court of Nevada decision
     for conformity with, for example, joinder cases arising out of the Ninth Circuit.  That court's holdings instead in
27   *Runningeagle* and *Collins* instead state the dispositive rule on this claim on deferential review under AEDPA.
     *Fourth*, similarly, Petitioner is airing his disagreement with the state supreme court's application of the joinder
28                                                                                              (continued...)

1    ***Consideration of Possible Issuance of a Certificate of Appealability***

2          Under Rule 11 of the Rules Governing Section 2254 Cases, the Court must issue or

3    deny a certificate of appealability (COA) when it enters a final order adverse to Petitioner.

4          As to the claims rejected by on the merits, under 28 U.S.C. § 2253(c), a petitioner must

5    make a "substantial showing of the denial of a constitutional right" in order to obtain a

6    certificate of appealability. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000); *Hiivala v. Wood*,

7    195 F.3d 1098, 1104 (9th Cir. 1999).   To satisfy this standard, the petitioner "must

8    demonstrate that reasonable jurists would find the district court's assessment of the

9    constitutional claim debatable or wrong." *Slack*, 529 U.S. at 484.

10         As to claims rejected on procedural grounds, the petitioner must show: (1) that jurists

11   of reason would find it debatable whether the petition stated a valid claim of a denial of a

12   constitutional right; and (2) that jurists of reason would find it debatable whether the district

13   court was correct in its procedural ruling. *Slack*, 529 U.S. at 484.  While both showings must

14   be made to obtain a COA, "a court may find that it can dispose of the application in a fair and

15   prompt manner if it proceeds first to resolve the issue whose answer is more apparent from

16   the record and arguments." 529 U.S. at 485.   Where a plain procedural bar is properly

17   invoked, an appeal is not warranted. 529 U.S. at 484.

18         The Court will grant a certificate of appealability as to its rejection on the merits of

19   Grounds 1(B), 1(C), 1(D) and 1(E).  The Court remains of the view that its ruling on these

20   grounds was correctly decided.  However, the points are sufficiently debatable to warrant

21   _____

22        [121](...continued)
     rule in N.R.S. 173.115 in the wrong court.  That court's application of its own state's law, including its holding

23   that evidence of the offenses would have been cross-admissible in separate trials under its prior *Petrocelli*
     decision, is the final word on that subject.  Neither Nevada state law regarding severance in state criminal

24   trials nor the rules regarding severance in federal trials is controlling on the federal constitutional question.
     *E.g.*, *Grisby v. Blodgett*, 130 F.3d 365, 370 (9th Cir. 1997).  *Fifth*, Petitioner's strained suggestion that the

25   State was relieved of its burden of establishing that Petitioner stole the money from the Subway begs the
     question of whether the proof of the charges was unconstitutional.  There in any event was sufficient

26   circumstantial evidence reflected in the testimony of Subway employees Patricia Thorne and Tammy Cox for
     a jury to conclude that Brown stole the money.  See #29, Ex. 57, at 114-125 & 128-42.

27

28        In all events, however, there simply is no potentially viable claim here, given the binding Ninth Circuit
     authority in *Runningeagle* and *Collins*.

1    appeal.

2         The Court will deny a COA as to the remaining claims considered on the merits as well

3    as with respect to the dismissal of two grounds as untimely.

4         Taking the remaining grounds out of order to provide context, Ground 3 alleges that

5    the evidence was insufficient to sustain a conviction on the three counts of sexual assault.

6    There in truth simply is no good faith argument available on the facts presented that the

7    evidence was insufficient to convict for sexual assault.   The Court has extensively

8    summarized the trial evidence herein. **See text, *supra*, at 1-18.**   Petitioner would resolve all

9    inconsistencies in the evidence and inferences that might be drawn from the evidence

10   presented at trial in favor of the defense.   Controlling law instead clearly requires that a

11   reviewing court resolve all such inconsistencies and competing inferences in favor of the

12   prosecution, particularly under what is a doubly deferential review of the state supreme court

13   decision on the issue under AEDPA.  There, again, simply is no good faith argument in this

14   case that the evidence was constitutionally insufficient to sustain the conviction, particularly

15   on deferential review. **See text, *supra*, at 19-28.**

16        In Ground 1(F), Petitioner alleges that he was denied effective assistance of trial

17   counsel when counsel failed to move to suppress his statement to the police on the grounds

18   that he was not competent to waive his *Miranda* rights.  Regardless of whether or not the

19   reviewing court looks through to the state district court decision as the last reasoned decision,

20   jurists of reason would not find the rejection of the claim to be debatable or wrong.  Trial

21   counsel clearly made a strategic decision to rely on a redacted version of the statement,

22   rather than on live testimony by the previously convicted defendant, to present his side of the

23   story.  Having made that strategic decision, counsel was not required to further investigate

24   whether it would have been possible to suppress the statement.  In all events, however, a

25   holding that Petitioner did not demonstrate prejudice was not an objectively unreasonable

26   application of *Strickland*.  Petitioner did not demonstrate a reasonable probability of a different

27   outcome, based upon the prospect of either a motion to suppress actually succeeding or of

28   there being a different outcome at trial without the statement.  There was no other affirmative

-57-

evidence available to present Brown's side of the story, and if he took the stand himself to give his account – subject to cross-examination and impeachment by the prior conviction – there is not a reasonable probability of a different outcome at trial. **See text, *supra*, at 43-47.**

In Ground 1(G), Petitioner alleges that he was denied effective assistance when trial counsel failed to ask any followup questions of the victim and the sexual assault examination nurse regarding an alleged inconsistency between the victim's testimony that she resisted and the nurse's testimony that the absence of evidence of vaginal trauma was consistent with a witness who did not resist during the sexual assault itself. The argument that the victim's testimony was inconsistent with the nurse's testimony has nil persuasive force. By the time of vaginal penetration, the victim had been hit in the head with a frying pan, forcibly held and then forcibly moved to the bedroom, and threatened repeatedly with death if she did not comply with Petitioner's demands. Petitioner seeks to equate the victim's actual testimony that she resisted at earlier points with testimony that she did not give of continuing to resist during actual vaginal penetration, after she was attacked and threatened with death. Trial counsel did not render deficient performance by not pursuing additional questions regarding an alleged inconsistency that was illusory rather than real. **See text, *supra*, at 47-49.**

In Ground 1(I), Petitioner alleges that he was denied effective assistance of trial counsel when defense counsel failed to adequately develop evidence of the victim's drug use. Petitioner alleges that counsel failed to call the appropriate foundation witness to introduce a toxicology report, failed to request that the sample be retested to determine whether the victim used drugs closer to the time of the assault, and failed to present expert testimony allegedly establishing the impact of the victim's drug use on her perception of the events during the incident. It does not appear that the toxicology report, if it had been admitted at trial, would have established the amounts of drugs in the victim's system. She had admitted to smoking marijuana approximately nine hours before the attack and using methamphetamine two to three days prior. On state post-conviction review, Petitioner presented nothing more than bald supposition that further development of the evidence would have established that the amounts of drug metabolite left in the victim's system at the time

1    would support an expert opinion that she was intoxicated to the point of impairing her

2    perception during the attack.  The fact that metabolites in undefined amounts remained in her

3    system at the time of the sexual assault examination – standing alone – did not establish that

4    further factual development would have resulted in the presentation of significantly probative

5    expert testimony.  Petitioner therefore did not demonstrate that there was a reasonable

6    probability of a different outcome at trial but for the alleged deficiency by counsel.  The same

7    conclusion follows regardless of whether or not the reviewing court looks through to the state

8    district court decision as the last reasoned decision.  **See text, *supra*, at 49-53.**

9         In Ground 2, Petitioner alleges that he was denied rights to due process of law and a

10    fair trial when the sexual assault and battery charges against him were joined with charges

11    of burglary and grand larceny arising out of his stealing money from the Subway at which he,

12    the victim and her mother worked prior to his leaving town after the sexual assault.  Under

13    controlling Ninth Circuit precedent, Petitioner cannot demonstrate that the state courts'

14    rejection of this claim was either contrary to or an unreasonable application of clearly

15    established federal law because there are no United States Supreme Court holdings, as

16    opposed to *dicta*, on the point.  **See text, *supra*, at 53-55.**

17         With regard to the untimely Grounds 1(A) and 1(H), Petitioner does not present a

18    viable argument establishing a basis for either relation back or purported post-filing equitable

19    tolling at to these grounds.  **See #74, at 8-14.**

20         IT THEREFORE IS ORDERED that all remaining claims in the Petition are DENIED

21    on the merits and that this action shall be DISMISSED with prejudice.

22         IT FURTHER IS ORDERED that a certificate of appealability is GRANTED IN PART

23    and DENIED IN PART, such that a certificate of appealability is GRANTED as to Grounds

24    1(B), 1(C), 1(D) and 1(E) and a certificate of appealability is DENIED as to the dismissal of

25    Grounds 1(F), 1(G), 1(I), 2 and 3 on the merits and the dismissal of Grounds 1(A) and 1(H)

26    as untimely.  **See text, *supra*, at 56-59.**

27    ///

28    ///

1    The Clerk of the Court shall enter final judgment accordingly in favor of Respondents

2  and against Petitioner, dismissing this action with prejudice.[122]

3                    DATED:  September 24, 2013

4

5

6

7                                              _____
                                               PHILIP M. PRO
8                                              United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26    _____

27        [122]Petitioner's request for an evidentiary hearing is denied, as review under AEDPA is restricted to the
    record presented to the state court that adjudicated the merits of the claims.  *See Pinolster,* 131 S.Ct. at
28  1398-1401.